[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 10-12088

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 29, 2011
JOHN LEY
CLERK

D.C. Docket No. 8:08-cv-01377-JSM-MAP

BRUCE LANGFITT,

Plaintiff - Appellant,

versus

FEDERAL MARINE TERMINALS, INC.,

Defendant - Appellee,

BBC CHARTERING USA, LLC, et al.,

Defendants.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 29, 2011)

Before TJOFLAT, WILSON and RIPPLE,* Circuit Judges.

_____

* Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

TJOFLAT, Circuit Judge:

I.

In December 2007, Bruce Langfitt was employed full time by Able Body Temporary Services, Inc. ("Able Body"),[1] a labor broker in the business of furnishing its day-laborer employees to clients on a temporary basis. On December 13, Able Body supplied Langfitt and other employees to Federal Marine Terminals, Inc. ("FMT"), a company that operates longshoring facilities on the Florida coast, to assist in FMT's loading of a cargo ship. Soon after Langfitt began the longshoring services on behalf of FMT, however, a heavy piece of cargo being loaded into the ship's hold fell on him, and he was paralyzed from the waist down.

As compensation for his injury, Langfitt has been receiving the benefits guaranteed to him by the Longshore and Harbor Workers' Compensation Act (the "LHWCA" or "Act"), 33 U.S.C. § 901 et seq., a federal no-fault workers' compensation program that compensates "employee[s]" disabled from injuries[2]

_____

[1] Able Body has since been acquired by another labor broker, MDT Personnel.

[2] The Act defines "injury" to mean an

accidental injury or death arising out of and in the course of employment, and such occupational disease or infection as arises naturally out of such employment or as naturally or unavoidably results from such accidental injury, and includes an injury caused by the willful act of a third person directed against an employee

2

"occurring upon the navigable waters of the United States," or in adjoining areas used in "loading [or] unloading" certain vessels.  Id. § 903.[3]  Every "employer" of covered employees—"person[s] engaged in maritime employment, including any longshoreman or other person engaged in longshoring operations," id. § 902(3)[4]—must secure and pay the Act's compensation benefits.  Id. § 904(a).[5]

---

because of his employment.

33 U.S.C. § 902(2).

A disabled employee covered by the Act is eligible to receive compensation of "66 2/3 per centum" of the employee's average weekly wage, subject to weekly maximum and minimum rates, for as long as the injury's effects continue.  Id. § 908.  The minimum rate of compensation is 50% of the national average weekly wage or the employee's full wage if it less. The maximum compensation rate is 200% of the current national average weekly wage as determined by the Secretary of Labor.  Id. § 906(b)(1)–(2).

[3]  Specifically, 33 U.S.C. § 903 provides:

[C]ompensation shall be payable under this chapter in respect of disability or death of an employee, but only if the disability or death results from an injury occurring upon the navigable waters of the United States (including any adjoining pier, wharf, dry dock, terminal, building way, marine railway, or other adjoining area customarily used by an employer in loading, unloading, repairing, dismantling, or building a vessel).

Thus, the statute also covers specific survivors and dependents of an employee killed in the course of maritime employment.

[4]  The LHWCA's definition for employees covered by the Act also includes "any harbor-worker including a ship repairman, shipbuilder, and ship-breaker."  33 U.S.C. § 902(3).

[5]  An employer may secure the payment of compensation benefits either by (1) purchasing insurance from a commercial carrier that has been preauthorized by the U.S. Department of Labor to provide LHWCA insurance or (2) self-insuring, as long as the employer first receives the Department of Labor's authorization to do so.  U.S. Dep't of Labor Office of Workers' Compensation Programs, Health Benefits, Retirement Standards, and Workers' Compensation: Longshore and Harbor Workers' Compensation,

3

Because Langfitt was engaged in maritime employment, he was covered by the Act, and he has been paid the compensation benefits by Able Body's LHWCA insurer,[6] since Able Body had contractually agreed to secure and pay LHWCA compensation for all the day laborers it supplied to FMT for longshoring work.

Nevertheless, Langfitt, seeking to supplement his workers' compensation benefits, brought this negligence action against FMT,[7] claiming that the negligence of FMT's employees caused his injury.[8]  In response, FMT alleged, as

---

http://www.dol.gov/compliance/guide/longshor.htm (last updated Sept. 2009).  "When an employer obtains insurance through an insurance carrier, the employer's obligation to pay monetary benefits and provide medical benefits is equally the obligation of the insurance carrier."  Id.

[6]  LHWCA compensation is paid directly to the claimant, 33 U.S.C. § 914(a), in semimonthly installments, id. § 914(b).

[7]  Langfitt invoked the district court's diversity jurisdiction under 28 U.S.C. § 1332(a)(1), (2).  Diversity existed because Langfitt is a Florida citizen and FMT is a Canadian corporation.  Langfitt also sued BBC Chartering and Logistic GmbH Co., K.G, ("BBC"), a Texas corporation.  BBC is no longer in the case, however, because the company settled with Langfitt.  Therefore, for ease of discussion, we omit further reference to Langfitt's claim against BBC.

[8]  According to Langfitt's amended complaint, FMT employees were negligent through:

    a.      failure to properly prepare the ship's hold to receive the cargo safely;
    b.      failure to properly warn the men working in the #2 hold of the danger because of the way the cargo was rigged for loading;
    c.      failure to properly rig the cargo for safe loading;
    d.      failure to use proper dunnage to receive and safely stow the cargo;
    e.      failure to properly arrange the dunnage for safely stowing and securing the cargo;
    f.      failure to properly instruct and train the men in the hold about the danger of working and being in the hold during cargo operations.

Am. Compl. at 3–4 (September 9, 2008).

an affirmative defense, that it was Langfitt's employer, under § 904(a), at the time of Langfitt's injury and therefore immune from suit under the LHWCA, id. § 905(a) ("The liability of an employer prescribed in [§ 904(a)] shall be exclusive and in place of all other liability of such employer to the employee.").[9] Accordingly, at the close of discovery, FMT moved the district court for summary judgment under Federal Rule of Civil Procedure 56 based upon § 905(a).

The district court granted FMT's motion. The court agreed that FMT was Langfitt's employer at the time of his injury and that, consequently, § 905(a) barred Langfitt's tort claim. Langfitt now appeals the district court's grant of summary judgment,[10] raising only the issue of whether the district court erred in holding that FMT was his employer and that § 905(a) precluded his negligence claim.

## II.

We begin with an explanation of the fact-dependent standard that our precedents have established for determining who was the 33 U.S.C. § 904(a)

---

[9] However, "if an employer fails to secure payment of compensation as required by [the Act], an injured employee . . . may elect to claim compensation under the [Act], or to maintain an action at law or in admiralty for damages on account of such injury." 33 U.S.C. § 905(a).

[10] We have jurisdiction over Langfitt's appeal under 28 U.S.C. § 1291. On appeal, we review the district court's grant of summary judgment de novo, applying the same legal standards that bound the district court. Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999) (citations omitted).

5

"employer" in cases like Langfitt's, where the answer often is far from clear.[11]  In such cases, we have sought guidance from the common law's borrowed-servant doctrine, which is rooted in the laws of Agency and Tort, yet have modified that common-law standard in order to appropriately consider important policy concerns unique to the LHWCA.

Throughout our discussion, we use the following terms of art:

- "Principal": one who has authorized another to act on his account and subject to his control.[12]

- "Agent": one authorized by another (i.e., the principal) to act on the other's account and under the other's control.[13]

- "Employer": a principal who employs an agent to perform service in the principal's affairs and who controls or has the right to control the physical conduct of the other in the performance of the service.  Thus, an employer is a species of principal.  All employers are principals, yet all principals are not necessarily employers.  A principal becomes an employer only if his right to control the agent's physical conduct is sufficient.[14]

---

[11]  As the Fifth Circuit has noted, the LHWCA, itself, offers little assistance to a determination of who constitutes an "employer" of injured workers for the Act's purposes.  Although the Act defines the term "employer," the definition merely limits the meaning of the term to those who employ employees for at least some "maritime employment."  Total Marine Servs., Inc. v. Dir., Office of Worker's Comp. Programs, U.S. Dep't of Labor, 87 F.3d 774, 777 n.4 (5th Cir. 1996).

[12]  See Restatement (Second) of Agency § 1(1), (2), cmt. d (1958).

[13]  See Restatement (Second) of Agency § 1(1), (2), cmt. e.

[14]  See Restatement (Second) of Agency § 2(1) (defining a "master," that is, an employer); see also id. § 1 cmt. d (explaining that the term master "is not used in contrast to the word

6

- • "Employee" (or "Servant"): an agent employed by an employer to perform service in the employer's affairs whose physical conduct in the performance of the service is controlled or is subject to the right to control by the employer. Thus, an employee is a species of agent. All employees are agents, yet all agents are not necessarily employees.[15]

- • "Independent Contractor": a person who contracts with another to do something for him but who is not controlled by the other nor subject to the other's right to control with respect to his physical conduct in the performance of the undertaking.[16]

## A.

One of the foremost status distinctions at common law is that between an employee and an independent contractor. The essence of the common law's test for whether an agent is an employee or an independent contractor is the control of details; that is, whether the principal has the right to control the manner and means by which the agent accomplishes the work. See, e.g., NLRB v. Steinberg, 182 F.2d 850, 857 (5th Cir. 1950) ("[T]he employer-employee relationship exists only where the employer has the right to control and direct the work, not only as to the result to be accomplished by the work, but also as to the manner and means by

'principal,' but is included within it").

[15] See Restatement (Second) of Agency § 2(2); see also id. § 1 cmt. e (explaining that an employee or "servant [is] an agent, for whose physical acts the employer is responsible").

[16] See Restatement (Second) of Agency § 2(3); see also id. § 1 cmt. e (explaining that an independent contractor is included within the meaning of "agent").

7

which that result is accomplished.");[17] see also, e.g., State ex rel. MW Builders, Inc. v. Midkiff, 222 S.W.3d 267, 270 (Mo. 2007) (en banc) ("An independent contractor is one who contracts to perform work according to his own methods without being subject to the control of his employer except as to the result of his work." (citations and internal quotation marks omitted)).

Significantly, it is the right and not the actual exercise of control that is the determining element of employment. Steinberg, 182 F.2d at 857; see also 3 Lex K. Larson, Larson's Workers' Compensation Law § 61, at 61-1 (Matthew Bender, Rev. Ed. 2011) ("It is the ultimate right of control, under the agreement with the employee, not the overt exercise of that right, which is decisive."). Consequently, assessing whether a principal had the right of control is highly fact-dependent, and a variety of considerations may be probative. These considerations include: (1) direct evidence of the principal's right to or actual exercise of control; (2) the method of payment for the agent's services, whether by time or by the job; (3) whether or not the equipment necessary to perform the work is furnished by the principal; and (4) whether the principal had the right to fire the agent. See, e.g., Larson, supra, § 61, at 61-1 (presenting the same four factors as the "principal

---

[17] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

factors showing right of control"); Restatement (Second) of Agency § 220 (1958) (describing the factors to be considered in assessing whether one is an employee).

Distinguishing between an employee and an independent contractor is particularly important in tort law. Ordinarily, a principal is not liable for the incidental physical acts of negligence in the performance of duties committed by an agent who is not an employee, but an employer is held liable to third parties for an employee's negligence under the doctrine of respondeat superior. Restatement (Second) of Agency § 220 cmt. e; see also id. § 219 ("A[n] [employer] is subject to liability for the torts of his [employees] committed while acting in the scope of their employment."). For it is the employer's ability to control the employee that allows the law to hold an otherwise non-faulty employer vicariously liable for the negligent acts of its employee acting within the scope of employment. See id. § 219 cmt. a ("The assumption of control is a usual basis for imposing tort liability when the thing controlled causes harm.").

It is in this tort-law context that the borrowed-servant doctrine arose. Courts recognized that "[i]t sometimes happens that one wishes a certain work to be done for his benefit, and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may[, however,] enter into an agreement with another [to] furnish[] him with men to do the work."

9

Standard Oil Co. v. Anderson, 212 U.S. 215, 221, 29 S. Ct. 252, 254, 53 L. Ed. 480 (1909).  But, in such cases, the question became: Which principal should be held vicariously liable when one of the furnished workers negligently injured a third person while acting in the scope of the worker's duties?

The borrowed-servant doctrine was created to help resolve this issue.  See Restatement (Second) of Agency § 227; see also, e.g., Gaudet v. Exxon Corp., 562 F.2d 351, 355–56 (5th Cir. 1977) (explaining that the borrowed-servant doctrine enables courts to hold the proper principal vicariously liable, as an employer, for the torts of an employee under the principle of respondeat superior).  The doctrine declares that an employee directed or permitted by his employer to perform services for another principal may become the employee—i.e., the "borrowed servant"—of the borrowing principal in performing those services.  When this is found to be the case, the borrowing principal is considered the "borrowing employer" and it is he, and not the employee's general employer,[18] that is held vicariously liable to third parties injured on account of the borrowed servant's negligence in the scope of the borrowed-employment relationship.  See, e.g., Standard Oil, 212 U.S. at 220, 29 S. Ct. at 253 ("One may be in the general service

_____

[18]  A general employer simply is "[a]n employer who transfers an employee to another employer for a limited period."  Black's Law Dictionary 566 (8th ed. 2004).  Langfitt's general employer was Able Body.

10

of another, and, nevertheless, with respect to particular work, may be transferred . . . to the service of a third person, so that he becomes the servant of that [third] person, with all the legal consequences of the new relation." (emphasis added)); see also, e.g., Gorton v. Rance, 52 So. 3d 351, 359 (Miss. 2011) ("Where the rule applies, the borrower . . . becomes the employer to the exclusion of the lender." (citations and internal quotation marks omitted)).

Therefore, the issue simply is whether the borrowing principal was the employer at the time of the negligent conduct. See, e.g., Kelley v. Rossi, 481 N.E.2d 1340, 1343 n.5 (Mass. 1985) ("The basic question [in assessing whether one was a borrowed servant] is generally no different from the normal one in determining whether an employee is the servant of a particular principal." (citations omitted)); see also Restatement (Second) of Agency § 227 cmt. a ("[T]he important question is not whether or not [the employee] remains the [employee] of the general employer as to matters generally, but whether or not, as to the act in question, he is acting in the business of and under the direction of one or the other."). In other words, the question is: Was the employee doing the work of and under the control of the borrowing principal? Coleman v. Steel City Crane Rentals, Inc., 475 So. 2d 498, 500 (Ala. 1985) (citations omitted); see also, e.g., Standard Oil, 212 U.S. at 221–22, 29 S. Ct. at 254 (explaining that to determine

11

which principal was the employer in a given case requires inquiry into "whose is the work being performed . . . which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work").[19]

Consequently, the same considerations relevant in determining whether a person was an employee, as opposed to an independent contractor, guide the borrowed-servant inquiry. Restatement (Second) of Agency § 227 cmt. c. The only distinction, however, is that the focus is now on the relationship between the two principals—i.e., the potential employers—and which of them had the right of control, rather than on the relationship of the principal and agent, as it is in the employee-independent contractor context. See, e.g., Larson, supra, § 67.02[1], at

---

[19] The Standard Oil Court explained the borrowed-servant doctrine inquiry thusly,

> If [men are furnished] to do the work, and place[d] . . . under [the borrowing principal's] exclusive control in the performance of it, those men become pro hac vice the servants of [the borrowing principal]. But, on the other hand, one may prefer to enter into an agreement with another that that other, for a consideration, shall himself perform the work through servants of his own selection, retaining the direction and control of them. In the first case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work, and they are, for the time, his workmen. In the second case, he who agrees to furnish the completed work through servants over whom he retains control is responsible for their negligence in the conduct of it, because, though it is done for the ultimate benefit of the other, it is still, in its doing, his own work. To determine whether a given case falls within the one class or the other we must inquire whose is the work being performed,—a question which is usually answered by ascertaining who has the power to control and direct the servants in the performance of their work.

Standard Oil Co. v. Anderson, 212 U.S. 215, 221–22, 29 S. Ct. 252, 254, 53 L. Ed. 480 (1909).

12

67-5 (explaining that the focus in the borrowed-servant inquiry at common law is on the two employers "and [on] what they agreed, how they divided control, how they shared payment, and whose work, as between them, was being done"). Probative considerations of the borrowing principal's right to control might therefore include: (1) direct evidence that the general employer expressly transferred control to the borrowing principal or that the borrowing principal exercised control; (2) evidence that the borrowing principal was responsible for paying the employee; (3) evidence that the borrowing principal furnished equipment necessary for performance of the work; and (4) evidence that the borrowing principal had the right to terminate its relationship with the employee. See, e.g., Standard Oil, 212 U.S. at 225, 29 S. Ct. at 255–56 (explaining that such considerations aid "in determining whose is the work and whose is the power of control"); Coleman, 475 So. 2d at 500 (considering such evidence in assessing whose work the employee was doing and under whose control he was doing it); J.A. Robinson Sons, Inc. v. Wigart, 431 S.W.2d 327, 331–32 (Tex. 1968), overruled on other grounds by Sanchez v. Schindler, 651 S.W.2d 249 (Tex. 1983) (same).

B.

Although its original application is in tort law, under the principle of

respondeat superior, the borrowed-servant doctrine has received general

application in matters related to workers' compensation and similar remedies,

Touchet v. Travelers Indem. Co., 221 F. Supp. 376, 379 (W.D. La. 1963) (citations

omitted). This includes our compensation cases arising under the LHWCA. E.g.,

Hebron v. Union Oil Co. of Cal., 634 F.2d 245, 247–48 (5th Cir. Jan. 1981);

Gaudet, 562 F.2d at 355.[20]

When we apply the doctrine to cases arising under the LHWCA, however,

our focus is more limited than at common law. Rather than to decide which

principal, if any, to hold liable for an employee's torts, we apply the doctrine in

the LHWCA context only to assess whether an employee covered under the Act,

and injured in the course of employment, was a borrowed servant at the time of

injury. Where this has been the case, we have read the term "employer" in the Act

to include the borrowing employer. See Total Marine Servs., Inc. v. Dir., Office

of Worker's Comp. Programs, U.S. Dep't of Labor, 87 F.3d 774, 777 (5th Cir.

1996) (explaining Hebron's and Gaudet's application of the borrowed-servant

doctrine to cases arising under the LHWCA). The borrowing employer,

---

[20] In a case that presents no genuine issue of material fact, whether there was a borrowed-employment relationship under the LHWCA is a question of law for the court. Gaudet v. Exxon Corp., 562 F.2d 351, 357–58 (5th Cir. 1977) (citations omitted).

14

consequently, is liable to the injured employee for the Act's compensation benefits, but immune from all tort liability due to the Act's exclusivity provision, 33 U.S.C. § 905(a).[21] See, e.g., Champagne v. Penrod Drilling Co., 341 F. Supp. 1282, 1285 (W.D. La. 1971), aff'd, 459 F.2d 1042 (5th Cir. 1972), modified on other grounds, 462 F.2d 1372 (5th Cir. 1972) (holding that a deceased worker was a borrowed servant and that the administrator of the worker's estate therefore was entitled to claim the benefits of the LHWCA against the borrowing employer, but, consequently, was subject to the limitations on tort suits imposed by § 905(a)).[22]

Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir. 1969), is our seminal case applying the borrowed-servant doctrine to the LHWCA. Ruiz assumed that the

---

[21] The employee may only recover benefits from one employer; if the general employer or its LHWCA insurer pays the Act's compensation benefits, indemnification may be sought from the borrowing employer. See, e.g., Total Marine, 87 F.3d at 779 (holding that the borrowing employer was liable for injured employee's LHWCA compensation and that the general employer was entitled to reimbursement from the borrowing employer since general employer had already paid those compensation benefits).

[22] Other circuits have held the same. E.g., Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935 (3d Cir. 1990); Huff v. Marine Tank Testing Corp., 631 F.2d 1140 (4th Cir. 1980). As has the Benefits Review Board of the Department of Labor, which reviews and issues decisions in appeals of workers' compensation claims under the LHWCA. E.g., Fitzgerald v. Stevedoring Servs. of Am., BRB No. 00-0724, 2001 WL 94757 (Ben. Rev. Bd. Jan. 31, 2001) (en banc).
    Moreover, our application of the borrowed-servant doctrine in cases arising under the LHWCA is consistent with application of the doctrine to state workers' compensation laws by the State courts. E.g., Anderson v. Tuboscope Vetco, Inc., 9 P.3d 1013 (Alaska 2000); Stuyvesant Corp. v. Waterhouse, 74 So. 2d 554 (Fla. 1954); French v. J.A. Terteling & Sons, Inc., 274 P.2d 990 (Idaho 1954); Whitehead v. Safway Steel Prods., Inc., 497 A.2d 803 (Md. 1985); LaVallie v. Simplex Wire & Cable Co., 609 A.2d 1216 (N.H. 1992); Ghersi v. Salazar, 883 P.2d 1352 (Utah 1994); Meka v. Falk Corp., 306 N.W.2d 65 (Wis. 1981).

15

doctrine applied in cases arising under the Act, but found that, under the case's

facts, the injured employee was not a borrowed servant at the time of his injury. In

so ruling, the court relied entirely upon the common law's formulation of the

borrowed-servant doctrine, as espoused in Standard Oil. That is, the Ruiz court

focused its analysis on which principal, at the time of the employee's injury, had

the right to control the employee and was having its work performed by the

employee. 413 F.2d at 312–13.[23]

---

[23] The court in Ruiz v. Shell Oil Co., 413 F.2d 310, 312–13 (5th Cir. 1969), presented nine factors, or evidentiary indicia, that it said common law courts have considered probative of borrowed employment. These, now named, "Ruiz factors" have been enumerated as the following nine questions:

> (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> (2) Whose work is being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?

Gaudet, 562 F.2d at 355; cf. Restatement (Second) of Agency § 220 (presenting similar considerations as indicia of who had the right to control the work). As authority for each of these factors, Ruiz cited Standard Oil, which applied the borrowed-servant doctrine for purposes of respondeat superior and stated that the borrowed-servant analysis is meant to determine "whose," among the two employers, "is the work [being done] and whose is the power of control." Standard Oil, 212 U.S. at 225, 29 S. Ct. at 255. Consequently, although presented as nine distinct factors, the borrowed-servant analysis in Ruiz focused entirely on the common law concerns of which principal had control and which principal's work was being performed; the individual factors merely were offered as circumstances probative of these considerations. See, e.g., id. (stating that such considerations "are not the ultimate facts, but only those more or less

16

After Ruiz, however, we recognized that the policies that undergird the LHWCA necessitate a restatement of the common-law conception of the borrowed-servant doctrine when it is applied in cases arising under the Act. This is because the LHWCA, like all workers' compensation laws, represents a policy-based tradeoff, or a statutorily imposed "industrial bargain." The covered employee has surrendered the right to sue the employer for negligence, and thus has eschewed the possibility of a more significant damages award from the employer; the employer, similarly, has relinquished its common law defenses available in employee negligence actions. In consideration, the employee receives more certain compensation for injuries arising from the employment, regardless of fault; the employer, in turn, eludes litigation expenses and pays only scheduled LHWCA benefits. See, e.g., Gaudet, 562 F.2d at 356 ("The LHWCA was designed to provide an injured employee with certain and absolute benefits in lieu of possible common law benefits obtainable only in tort actions against his employer." (citation omitted)); Haynes v. Rederi A/S Aladdin, 362 F.2d 345, 350 (5th Cir. 1966) (declaring that "the whole theory of the Act, and of similar compensation legislation, is to provide the injured workman with certain and absolute benefits in lieu of all common law damages" (emphasis omitted)); see

useful in determining whose is the work and whose is the power of control").

also, e.g., Larson, supra, § 67.02, at 67-5 (explaining that, under a workers'

compensation scheme, a borrowed servant loses rights, while gaining others, in

striking up a new employment relationship, in particular "the right to sue the

[borrowing] employer at common law for negligence" is sacrificed). Employees

who begin work for an employer covered under the Act are presumed to have

consented to this forced tradeoff. Gaudet, 562 F.2d at 356.

In light of the Act's statutorily imposed bargain, we have acknowledged that

Ruiz's sole reliance on the common law's control test is misplaced. See id. at 357

(stating that the traditional borrowed-servant doctrine, with its emphasis on

control, "should not be applied blindly" to the LHWCA context, that is, "in

circumstances in which it did not evolve"). Rather than focusing only on whether

a borrowing principal assumed control over the employee from the general

employer, we also require that it be shown that the employee gave deliberate and

informed consent to the borrowed-employment relationship before that

relationship will be held to bar the employee's common law cause of action.[24] See

---

[24] Nevertheless, Gaudet does make clear that control is a key factor in the analysis. The Gaudet court focused on control as one of the primary bases for its conclusion that a borrowed-employment relationship existed. See 562 F.2d at 358 (stating that the two plaintiffs were borrowed servants because, in addition to evidence of their consent, each undisputedly was subject to their principal's control and direction while performing the principal's work). Moreover, in Hebron v. Union Oil Co. of California, a case applying Gaudet, the court found significant to its borrowed-servant analysis that the borrowing employer had had the "power to direct and supervise" the borrowed servant. 634 F.2d 245, 247 (5th Cir. Jan. 1981).

18

Hebron, 634 F.2d at 247 (citing Gaudet, 562 F.2d at 355) (explaining that an employee of one principal becomes the borrowed servant of another only if transferred by the former with the employee's consent to the latter's employ); see also, e.g., Ghersi v. Salazar, 883 P.2d 1352, 1357 (Utah 1994) (stating that without consent to the employment relationship, "there can be no employment relationship for purposes of workers' compensation" under Utah's workers' compensation law (citations omitted)); Larson, supra, § 67.02, at 67-4 to -5 (explaining that the borrowed-servant problem in the workers' compensation context is different from that at common law because the focus necessarily must be placed on the employee and whether the employee consented to the transfer of allegiance to the borrowing employer). It plainly would be unfair, we have acknowledged, to bar an employee from bringing tort actions against a negligent principal when the employee did not have an opportunity to evaluate the risks posed by the new employment and to assume them consciously. Gaudet, 562 F.2d at 356–57.

The test for consent, however, is an objective one, and the employee may be shown to have consented either expressly or impliedly. E.g., Willis v. Cabinda Gulf Oil Co., 728 F. Supp. 328, 338–39 (D. Del. 1990) (citations omitted). Thus, we have acknowledged, regardless of the employee's subjective intent, consent may be gleaned from the employee's conduct and the nature of the employee's

19

relationship with the borrowing principal.  See, e.g., Gaudet, 562 F.2d at 356

(stating that, "by the very act of continuing in employment, [the employee] may be

assumed to agree" to the LHWCA's trade-off (emphasis added)); see also, e.g.,

Meka v. Falk Corp., 306 N.W.2d 65, 70 (Wis. 1981) ("Whether plaintiff consented

[under Wisconsin's workers' compensation law] is not dependent on the existence

of an express written or oral contract or agreement between the parties or on

plaintiff's intentions or on plaintiff's understanding[; it may be found] in the

actual nature of plaintiff's relationship [with the borrowing principal].").

For example, one factor we have considered probative of an employee's

implied consent to borrowed employment is the duration of the relationship at

issue.  See, e.g., Gaudet, 562 F.2d at 357 (presenting duration of employment as a

factor relevant to determining whether the employee consciously consented to the

borrowed-employment relationship).  A long-term employment relationship with a

borrowing principal strongly suggests that the employee consented to being a

borrowed servant.  See, e.g., Capps v. N.L. Baroid-NL Indus., Inc., 784 F.2d 615,

618 (5th Cir. 1986) ("In the case where the length of employment is considerable,

[the duration of employment factor] supports a finding that the employee is a

borrowed [servant].").  Yet, evidence that the employment relationship was of a

short duration—meaning the employee's injury occurred early in the relationship

20

with the borrowing principal—does not necessarily mean that consent was not given.  See, e.g., id. (stating that, although a long-term relationship supports a finding of borrowed employment, "the converse is not true").  Other evidence concerning the employee's conduct and the nature of the employee's relationship with the borrowing principal still might show that the employee gave consent.  See, e.g., id. (explaining that, when short, the duration of employment provides only a "neutral assessment"); see also, e.g., Champagne, 341 F. Supp. at 1284, aff'd, 459 F.2d 1042 (5th Cir.) (finding borrowed employment in case where the employee's injury occurred on the job's first day).[25]

---

[25]  Langfitt argues that Gaudet makes the consideration of duration of employment more sacrosanct to the consent analysis than this.  He points to a statement in Gaudet in which the court suggested that one of the two "most pertinent" considerations to its borrowed-servant analysis was whether "the employment with the new employer [was] of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto."  562 F.2d at 357.  Langfitt claims that this statement precludes courts from finding borrowed employment in cases where the employee's relationship with the borrowing principal was short-lived.

Whatever the value is of Gaudet's "suggested focus within [the Ruiz] test," id. at 359 (emphasis added), it in no way controls our analysis here.  Gaudet (and Ruiz) make it abundantly clear that, in applying the borrowed-servant doctrine in LHWCA cases, "the facts of each case must control the result."  Id. at 357 (emphasis added).  Length of employment was highly significant evidence of consent in Gaudet merely because the relationship between the two workers and their principals was of a considerable length.  Both Gaudet plaintiffs—neither of whom was generally employed by a company that brokered laborers—had been under the exclusive control and direction of their borrowing employers for at least 12 years, which gave them "full opportunity to evaluate the risks" of the work.  Id. at 358.  Thus, "[d]uring all of that time [, they] had acquiesced in [their] arrangements."  Id.  Yet, as discussed in the text above, simply because evidence of a long-term relationship is highly probative of an employee's implied consent, the opposite is not true.

Moreover, we note that the other "most pertinent" consideration to the Gaudet court was whether the borrowing principal was responsible for the working conditions experienced by the

21

C.

Based on the foregoing discussion, we distill this statement of the standard

that our precedents have established for determining whether a borrowed-

employment relationship exists in cases arising under the LHWCA:

When a general employer transfers its employee to another person or
company, the latter is the employee's borrowing employer for
purposes of the LHWCA, and thus is liable for the Act's
compensation and has the benefit of the Act's tort immunity, if each
of the following three criteria is satisfied:

(1) Employee Consent to the New Employment Relationship. The
employee must be shown to have given deliberate and informed
consent to the new employment relationship with the borrowing
principal. The test is objective, and the employee's consent may be
shown to have been given either expressly or impliedly.

(2) Borrowing Principal's Work Being Done. The work being
performed by the employee at the time of the injury must be
shown to have essentially been that of the borrowing
principal—that is, that it was primarily the borrowing
principal's interests that were being furthered by the
employee's work.

(3) Borrowing Principal Assumed Right to Control the Details of
Employee's Work. The borrowing principal must be shown to have
received, from the employee's general employer, the right to control
the manners and details of the employee's work. This might be

employee, and the risks inherent therein. Id. at 357. As the Gaudet court explained, however,
this merely "parallel[ed] the Ruiz tests of which employer furnishes tools and place of
performance and whether the first employer has terminated his relationship with the employee."
Id. As we have indicated, such considerations are simply some indicia of the borrowing
principal's right to control the employee and, in no way, are outcome-determinative in all cases
raising questions of borrowed employment under the LHWCA.

evidenced by: (a) an express agreement between the general employer and the borrowing principal that directly evidences a transfer of control over the employee to the borrowing principal; (b) the borrowing principal's actual exercise of control; (c) the borrowing principal's furnishing of the equipment and space necessary for the employee to perform the work; (d) the borrowing principal's right to terminate the employee's relationship with the borrowing principal; and (e) the method and obligation of payment for the employee's services.

Cf. Larson, supra, § 67.01, at 67-1 to -2 (presenting a similar three-part framework). We apply this standard to the facts of Langfitt's case in part III.

III.

A.

We begin with a recitation of the facts relevant to our LHWCA borrowed-employment inquiry. The facts are presented in a light most favorable to Langfitt. See Whatley v. CNA Ins. Cos., 189 F.3d 1310, 1313 (11th Cir. 1999) ("[W]e view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." (citation omitted)).

1.

By December 2007, Langfitt had been employed for "some time" by Able Body and had come to be considered, by Able Body management, one of the company's best day-laborer employees due to his hard work. Nonetheless, on December 13, Langfitt had not been found a job by Able Body in over two weeks,

23

and the gap in pay was causing him concerns. So, with bills mounting and a dog to care for, he awoke early that morning and went to Able Body hoping to find paying work for the day.

When Langfitt arrived at Able Body, he asked the employee in charge of the company's office if any "real good" jobs were available for the day. The office employee told Langfitt that, indeed, there was one promising opportunity with an Able Body client "out at the shipyard," at Port Manatee Pier, and that he wanted Langfitt "on the ticket" for the job because it required quality workers. The job was particularly attractive, the office employee explained to Langfitt, because it offered an opportunity eventually to become a full-time employee of the Able Body client. Langfitt, attracted by this possibility and eager to be paid again, immediately volunteered. He was then handed safety equipment needed for the job—a reflective safety vest and a hard hat—and before too long, he and four other Able Body employees departed for the job site at the peer.[26]

Langfitt never asked any questions concerning the specifics of the upcoming work. This was partly because Langfitt had some maritime-employment experience. During the late-1980s or early-1990s, Langfitt had worked for a "few months" in a temporary employment position as a "mucker" in

---

[26] Langfitt rode in a van owned and driven by one of the other Able Body laborers.

the hold of an oil tanker—a mucker is one who cleans excess crude oil out of ships' ballast tanks and holds. At that time, despite the apparent risks associated with the mucker's role, Langfitt never received any orientation or safety training. Instead, his training was entirely "on the job"; he was placed with a more experienced mucker who showed him what to do down in the ship's hold.

2.

Langfitt, however, although he did not know it, actually had volunteered to work in a position for which he had no experience—as a longshoreman, on behalf of FMT. Under an ongoing relationship with Able Body of nearly two years,[27] FMT, whenever it needed additional workers to load or unload ships at Port Manatee, would request day laborers from Able Body.[28] FMT had ordered Able Body laborers for December 13 because it had been hired by BBC Chartering and Logistic GmbH Co., K.G, ("BBC") to load a dismantled sugar mill—which BBC

---

[27] The record suggests that the relationship began on or about April 19, 2005.

[28] The record indicates that no written contract ever was entered between FMT and Able Body to reflect this long-term understanding. Instead, they had an "open-ended" agreement, whereby "[a]s long as Able Body wanted to work with FMT [, Able Body] would work with them and as long as FMT wanted to work with Able Body[, Able Body] would work with them." In other words, it was an oral understanding "whereby as long as [Able Body] got a heads-up or advance notice that [FMT] needed X number of laborers . . . on a given day to either load . . . or unload a ship [FMT] could call . . . [and Able Body] would . . . have the laborers there."

was to deliver to the Philippines—into the hold of a BBC-chartered cargo ship named the "SJARD."[29]

Able Body and FMT formalized their agreement through a customary Able Body work order, which the parties had used previously when Able Body supplied laborers for other FMT longshoring projects. The back of that work order specified the "conditions of service" governing the parties' relationship for December 13. Under those terms, FMT agreed to become "the co-employer of all workers provided [by Able Body]." In that role, it further agreed to be "solely responsible for supervising and directing the activities of the workers between [their] arrival at and departure from the jobsite."[30] Pursuant to this authority, the work order gave FMT the right to discharge any Able Body employee with respect to the temporary position with FMT.[31]

Moreover, the work order established how the Able Body employees would be compensated. Able Body, not FMT, was to "pay [the Able Body] workers and

---

[29] The SJARD was built in 2007. It is a Multipurpose Tweendecker cargo ship, which has a hold capacity of 759,121 cubic feet. The ship is strengthened for heavy cargoes and is equipped for the carriage of containers and for the carriage of dangerous goods. On board, there are three NMF (Neuenfelder Maschinen Fabrikeurope) cranes situated portside. Each crane has an individual capacity of 80 megatons and a combined capacity of 160 megatons.

[30] Able Body only transferred FMT authority over work consistent with their agreement. That is, the terms of the work order, for safety purposes, did not permit FMT to alter the job duties from those previously agreed upon by the parties.

[31] FMT did not have the power to terminate the employee's employment with Able Body.

[would] withhold and pay all taxes required by law." But Able Body was to charge FMT a service fee based on an agreed-upon rate tied to the hours worked by each Able Body worker.[32] Able Body then was to use a percentage of the funds collected to remunerate its employees based on the number of hours each had worked for FMT. An employee's receipt of this compensation was conditioned on an FMT supervisor's signed authorization—that is, at the end of the work day, an FMT supervisor would have to sign the Able Body work order and attest to the amount of hours worked by each Able Body employee. Absent an FMT supervisor's attestation, Able Body would not compensate its laborers for their longshoring work.[33]

Furthermore, the service fee to be charged of FMT was higher per employee because, in consideration, Able Body had agreed to secure LHWCA compensation coverage for all Able Body employees supplied to FMT for longshoring projects and to waive all potential indemnity rights.[34] Able Body secured that LHWCA

---

[32] The record includes an Able Body "Rate Verification Sheet" for FMT, dated April 19, 2005, which reflects an agreed upon rate of $11.90 per hour, per employee.

[33] The Able Body work order was signed and certified by FMT representative Les Thompson.

[34] Workers' compensation is reflected in the "Rate Verification Sheet," which includes a specific checked-off box stating that "Workers Compensation coverage included above rates [of $11.90 per hour, per employee]."

27

coverage through an endorsement to its "Workers Compensation and Employers Liability Policy."[35] The policy was in effect on December 13, 2007.[36]

3.

Langfitt and the other Able Body employees who had volunteered for the FMT job arrived at Port Manatee Pier at around 7 a.m. Upon arrival, they drove to FMT's terminal at the pier, where the SJARD was docked. They waited at the dock briefly before they went to a nearby FMT office building to sign in as present.

Langfitt was then told "to report to a guy named Jeff [Swan]," who could be found on board the SJARD. While Langfitt never was told for whom Swan worked, he knew Swan definitely was "[o]ne of the people that actually worked for who we were coming out there to do work for," i.e., Able Body's client, FMT. (Indeed, it turned out, Swan was an FMT supervisor.)

After signing in, Langfitt grabbed his safety equipment and headed to find Swan on the SJARD; as he approached the ship and ascended the gangway, he noticed several large pieces of steel cargo and lumber laying on the dock near the

---

[35] The policy covered workers' compensation payments required under the laws of Florida and Texas. It was issued by American Home Assurance Company, a subsidiary of American International Group, Inc.

[36] Able Body had renewed the policy for a period of December 1, 2007, through December 1, 2008.

28

ship.[37]  Once on board the ship, Langfitt was met by some of the vessel's crew

members.[38]  The crew members told Langfitt to follow another Able Body

employee toward the front of the ship, and Langfitt did.[39]  Once there, Langfitt and

his coworker proceeded down into the ship's #2 hold, which Langfitt immediately

saw was "quite full" of steel cargo.

Langfitt, along with other laborers present in the #2 hold,[40] waited a few

minutes for Swan to arrive to provide him with instructions on his tasks for the

day.[41]  When Swan arrived, Langfitt immediately recognized that Swan was not an

Able Body employee, but rather was definitely "the guy running what was going

on down [in the hold]" because Swan "had a radio on him."  Langfitt then

_____

[37]  Around this time, FMT conducted a "Vessel Safety Briefing," which addressed various safety precautions workers should take while loading cargo onto the SJARD.  Although at least two of the Able Body-supplied employees were present at this briefing—having signed the briefing's attendance form—Langfitt was not.

[38]  The crew initially had Langfitt and the other Able Body employees register their presence on board the SJARD.

[39]  Langfitt knew the other man also was an Able Body employee because he was the employee who had driven Langfitt to the pier.

[40]  Langfitt remembers there being three Able Body employees, including himself, in the #2 hold.

[41]  While he waited, Langfitt became hesitant about the potential job facing him.  He expressed his nervousness to a coworker by saying that the situation "'don't feel right.'"  Langfitt, however, soon suppressed these hesitations when the coworker responded, "'Dude, you go up to that hatch, you might as well keep going home.'"  Langfitt interpreted this to mean that he would not be paid for the day if he exited the hold, so he quietly waited for Swan to show up without telling anyone else about his concerns.

approached Swan and asked him, "What do you want me to do?" In response, Swan told Langfitt merely to "[s]tand right here [with me, and] [d]on't move until I tell you to and just help me out with what I need help with."

Langfitt obeyed. As he awaited Swan's further instructions, Langfitt noticed that a large piece of the steel cargo from the dock—as it turned out, a fan casing from the disassembled mill—was slowly being lowered into the #2 hold by a crane. The giant cargo looked to Langfitt as though it was precariously secured to the crane, yet the loading process, led inside the hold by Swan, was continuing uninterrupted and Langfitt continued to stand by and await Swan's direction.

Although Swan was leading the operation inside the hold, he was taking his own orders on how to load the cargo from a BBC representative, Captain James Bond. Captain Bond had been hired to oversee the overall mill loading operation and was standing on the dock telling an FMT dock superintendent how he wanted the cargo loaded and stowed inside the hold. The dock superintendent was then relaying Captain Bond's directions to Swan via radio.

For loading the fan casing, Captain Bond instructed Swan to land the cargo on top of metal gears already stowed in the hold and to store it "standing up" in a

particular orientation.[42]  And, once the crane started to lower the casing into the hold, Captain Bond went onto the ship to instruct Swan further on how best to land the fan casing onto the gears.

Swan, to carry out Captain Bond's orders, instructed two of the laborers at his command in the hold to exit the hold and retrieve from the dock pieces of dunnage, i.e., lumber used to support stored cargo.  The dunnage was to be placed on the gears to support the fan casing.  Once those workers exited the hold, Swan told Langfitt to go to the other side of the overhanging cargo so that Langfitt could assist Swan in laying down the soon-to-be-brought-in dunnage on the gears. Langfitt again obeyed Swan's commands and walked to the other side of the fan casing.

Once the dunnage arrived, Swan instructed Langfitt on how to place it properly on the gears.  Langfitt, following Swan's guidance, helped place the dunnage down.  Then, once the dunnage was set, Swan directed Langfitt to walk back to Swan's side of the lowering fan casing.  Langfitt, once again, listened and began to walk back to Swan.

---

[42]  It took multiple tries, due to the awkward proportions of the object, to lower it in the orientation desired by Captain Bond.

However, as Langfitt did so, the fan casing—which weighed over two tons—fell from the hold of its crane, hit the base of the ship's hold, and landed on top of the dunnage that Swan and Langfitt had just laid down. The dunnage splintered, which caused the fan casing to shift and fall on its side. When it fell, the two-ton object captured Langfitt, pinning him underneath. The accident, which occurred a little after 7:30 a.m., approximately thirty minutes after Langfitt had arrived at the job, left Langfitt paralyzed from his waist down.

4.

After Langfitt was injured, he filed a claim to recover LHWCA compensation benefits from Able Body's insurer. The insurer accepted the claim and has since been paying Langfitt the Act's stipulated benefits.

B.

We now apply the LHWCA's borrowed-employment standard presented in part II.C, supra, to the foregoing facts. In doing so, we assess only the standard's first element (employee consent), in section 1, and third element (the right to control), in section 2. We do not consider the test's second element here because Langfitt concedes that the district court properly determined that he was essentially doing FMT's work when he was injured. That is, as the district court

32

concluded, "FMT was hired to load the vessel and, in turn, hired temporary employees [like Langfitt] to assist in its work."

1.

It is clear that Langfitt consented to being FMT's borrowed servant, notwithstanding the brevity of their relationship. An employee's consent, as discussed in part II, supra, need not be express; consent may be implied from the employee's conduct and the nature of his relationship with the borrowing principal. Here, the district court concluded that the nature of Langfitt's relationship with FMT implied Langfitt's consent because he, through his employment with Able Body, a labor broker, knowingly agreed "to going to new work situations on a regular basis," including FMT's longshoring project.

This conclusion was proper. Courts almost invariably have determined that employees of a labor broker, by accepting their employment with the labor broker, consciously consented to being sent to work in varying employment situations, under the direction and control of their employer's various clients. See, e.g., Capps v. N.L. Baroid-NL Indus., Inc., 784 F.2d 615, 617 (5th Cir. 1986) (finding that an employee of a labor broker, by taking such employment, consented to all temporary employment situations in which his employer placed him, since "going into new work situations was [his] work situation"); McMaster

33

v. Amoco Foam Prods. Co., 735 F. Supp. 941, 944 (D.S.D. 1990) ("[A] temporary employee supplied by a temporary employment agency . . . has an implied contract with the [borrowing] employer for services."); Meka v. Falk Corp., 306 N.W.2d 65, 70 (Wis. 1981) ("Plaintiff knew when he was hired by [the labor broker] that his work would be performed for customers of [the labor broker]."). And consent is even more apparent in cases where the employee of a labor broker undertook the job assignment voluntarily. See, e.g., Evans v. Webster, 832 P.2d 951, 955 (Colo. App. 1991) (finding consensual relationship based on the fact that the employee of a labor broker knew she would be sent to different locations by her general employer and "could have declined to accept the assignment if she chose" (emphasis added)); Ghersi, 883 P.2d at 1357 ("When an employee of a temporary labor service who has the right to accept or decline an assignment accepts an assignment, he enters into an implied contract of hire with the [borrowing] employer.").

Here, when Langfitt—who also had worked for other labor brokers previously—agreed to be Able Body's employee, he knew that he would be required to work under the control of Able Body's various clients, in differing roles. Langfitt also was not a new employee of Able Body. By December 13, 2007, he had been employed by Able Body for, what Langfitt calls, "some

34

time"—indeed, long enough to earn the reputation as one of its best employees.

Through this experience, he had learned that any Able Body job assignment could require him to partake in labor for which he had little or no experience or training. His training, he discovered, often would be on the job; in fact, Langfitt's last assignment, prior to FMT, was a construction project in which he aided electricians in putting down in-ground conduit, notwithstanding his lack of electrical training. This explains why Langfitt did not feel the need to ask questions about what the FMT job would entail; the job's specifics simply were of no matter to him because he would do whatever was asked of him by Able Body's client, his employer for the day.[43]

Furthermore, Langfitt's assignment to the FMT job was voluntary, not compulsory. Needing money, he accepted assignment to the job "out at the shipyard," a maritime-employment position in an area in which he knew he had some, albeit limited, experience (as a mucker).[44] The job also had an added enticement; it was a "real good" opportunity for him because it offered a chance

---

[43] Indeed, onboard the SJARD, Langfitt, upon realizing that Swan was "the guy running what was going on down [in the hold]," instantly approached Swan and asked him, "What do you want me to do?"

[44] Langfitt also knew, when he volunteered for the FMT job, that on-the-job training occurs in the shipping industry due to his earlier mucker work. In that mucker role, which poses its own inherent risks, Langfitt received no formal substantive or safety training; instead, he simply was told to learn his job by watching and emulating a more experienced mucker.

to earn a consistent pay check as FMT's full-time employee.  See Lavergne v.

Chevron U.S.A., Inc., 782 F. Supp. 1163, 1170 (W.D. La. 1991), aff'd 980 F.2d

1444 (5th Cir. 1992) (finding probative of borrowed-employee status the fact that

a temporary roustabout had aspirations of becoming a full-time employee of his

borrowing employer since that position offered higher wages and better benefits).

In light of the foregoing factual circumstances, we conclude that, as a

matter of law, Langfitt consented to employment as a longshoreman with FMT.

Hence, it was not inequitable of the district court to force upon him the

LHWCA's tradeoffs, as long as FMT assumed, from Able Body, the right to

control the manner and details of Langfitt's work.  See, e.g., In re Knudsen, 710

F. Supp. 2d 1252, 1263 (S.D. Ala. 2010) ("[A]n employee is considered

'borrowed' when his general employer gives up control to the borrowing

employer." (citations and internal quotation marks omitted)).  We therefore turn

to that factor in our inquiry.

2.

The control element also is conspicuously satisfied.  Although the district

court concluded that FMT had the right to control Langfitt, Langfitt argues that

the court erred because it ignored Captain Bond's—and thus BBC's—role in

directing the SJARD loading operation.  According to Langfitt, "there is at least a

genuine issue of fact [as to] whether FMT truly exercised relevant control over . . . Langfitt, or <u>whether BBC actually did</u>," Appellant's Initial Br. at 30 (emphasis added), since the record suggests that Captain Bond directed Swan as to how the fan casing cargo should be loaded into the vessel's hold, <u>see</u> Appellant's Initial Br. at 31. Langfitt's contention, however, lacks merit.

As established, Langfitt's focus on whether FMT exercised control is misguided. The relevant inquiry is whether FMT had assumed the <u>right</u> to control Langfitt's longshoring work on December 13, 2007. <u>See, e.g.</u>, <u>Hebron</u>, 634 F.2d at 247 (finding it relevant that borrowing employer "had the <u>power</u> to direct and supervise" the employee (emphasis added)); <u>see also</u> Larson, <u>supra</u>, § 61.02, at 61-3 ("[T]he test is, and must be, based on the right, not the exercise."). Even if the details of the employee's work are actually controlled by someone other than the employer—i.e., someone who did not have the right to exercise that control—that does not supersede the existing employment relationship; the employer with the right to control remains the employee's LHWCA employer. Here, the great weight of the evidence plainly indicates that Able Body transferred to FMT—and only to FMT—the power to control the manner and details of Langfitt's work on December 13, 2007.

First, Able Body, through the parties' work order, expressly ceded authority to control Langfitt to FMT for the purposes of the longshoring operations. That customary work order, which the parties had used for previous engagements, established that FMT would be "solely responsible for supervising and directing the activities of [Able Body employees, including Langfitt,] between [their] arrival at and departure from the jobsite."[45] (Emphasis added). There plainly is no evidence that FMT and Able Body contemplated BBC exercising authoritative control over Langfitt.

Second, as Langfitt concedes, FMT had the right to terminate Langfitt's employment with FMT. See Larson, supra, § 61.08[1], at 61-22 ("The power to fire . . . is the power to control."). It is of no concern that FMT lacked authority to terminate Langfitt's general employment with Able Body. E.g., Hebron, 634 F.2d at 247.

---

[45] Langfitt argues that this language, alone, does not signify that FMT assumed control over him. However, at the same time, Langfitt concedes that "Able Body . . . terminated its relationship with . . . Langfitt during the workday." Appellant's Initial Br. at 39. This admission contradicts Langfitt's argument that FMT did not assume control over him. Able Body's termination of its employment relationship with Langfitt merely signifies that the company ceased control in its relationship with Langfitt, transferring such control to FMT for the day. See, e.g., Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1246 (5th Cir. 1988) (citing Capps v. N.L. Baroid-NL Indus., Inc., 784 F.2d 615, 617–18 (5th Cir. 1986) (stating that consideration of whether the general employer terminated its relationship with the employee merely is an issue of whether the general employer "had, in effect, ceased control in its relationship with [the employee]").

38

Third, FMT, at least in part, furnished the place for performance of Langfitt's work, since the SJARD was docked at FMT's marine terminal and dock at Port Manatee. Although Able Body provided the safety equipment that Langfitt wore, and BBC supplied much of the loading equipment, the fact that the SJARD was harbored at FMT's dock site leads us to conclude that the evidence of who furnished the equipment and space necessary for the work is at most neutral in terms of its probative value as to FMT's right to control Langfitt's work.[46]

Fourth, as Langfitt admits, FMT had the obligation to compensate Langfitt for his services, notwithstanding that FMT was not to pay him directly. Based on FMT and Able Body's preexisting agreement, FMT was to pay Able Body a service fee at a rate tied to the number of hours worked by each Able Body employee. Able Body, in turn, was to use part of those funds to pay its employees based on the time they worked for FMT, and only after FMT had attested to the hours worked. Thus, in reality, FMT was to pay Langfitt's wages, via Able Body, based on the number of hours Langfitt worked for FMT; it is not relevant that Able Body was to keep a percentage of the amount furnished by FMT. See, e.g.,

---

[46] Nevertheless, the other factors discussed greatly weigh in favor of the propriety of the district court's conclusion that FMT had the right to control Langfitt's work.

39

Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1246 (5th Cir. 1988) (citing

Capps, 784 F.2d at 618) (ruling that the borrowing employer had an obligation to

pay the borrowed servant based on similar facts); see also Larson, supra, § 67.06,

at 67-17 to -18 ("[W]hether the [borrowing] employer pays the general employer

who in turn pays the employee . . . or whether the [borrowing] employer pays the

employee direct, the difference for [borrowed-employment] purposes is one of

mechanics and not of substance.").

Finally, FMT's right to control Langfitt's work is further shown by the

evidence that FMT actually exercised control. Swan, an FMT-employed

supervisor and the man Langfitt recognized and considered to be "the guy

running what was going on down in the [SJARD's hold]," clearly controlled and

directed Langfitt's work inside the SJARD. Swan directed Langfitt where to

stand and to help lay the dunnage on the gears. It is of no matter here that BBC,

through Captain Bond, may have been telling Swan how BBC wanted him to load

the vessel's hold. There simply is no evidence in the record that suggests that

Captain Bond, in any way, directed the particular longshoring tasks performed by

Langfitt. Indeed, Swan had full discretion over how best to utilize his staff of

longshoremen, including Langfitt, in order to, as he said to Langfitt, have them

40

"help . . . out with what [he] need[ed] help with" in accomplishing BBC's objectives.

Based on the entirety of the preceding facts, we find that the undisputed evidence in the record weighs heavily in favor of the conclusion that FMT had the right to control Langfitt's longshoring work at the time he was injured on December 13, 2007.

3.

Because all the elements necessary for a borrowed-employment relationship are satisfied in light of the undisputed evidence, we agree with the district court that FMT was Langfitt's borrowing employer for purposes of the LHWCA and that, consequently, Langfitt's negligence claim is barred by 33 U.S.C. § 905(a). The judgment of the district court therefore is

AFFIRMED.[47]

---

[47] On appeal, Langfitt has also raised the argument—for the first time—that the district court, in considering FMT's § 905(a) defense, should have recognized that 1984 congressional amendments to the LHWCA preempt application of the borrowed-servant doctrine to § 904(a) and, therefore, rejected FMT's § 905(a) defense. Although Langfitt did not present this argument to the district court, he urges us to consider it because, as we have previously held, we will entertain an argument raised for the first time on appeal when it involves a pure question of law and our refusal to consider it would result in a "miscarriage of justice," Wright v. Hanna Steel Corp., 270 F.3d 1336, 1342 (11th Cir. 2001) (emphasis added) (citations and internal quotation marks omitted). The Third and Fifth Circuits have given full consideration to this preemption argument, however, and both have rejected it. E.g., Peter, 903 F.2d 935; West v. Kerr-McGee Corp., 765 F.2d 526 (5th Cir. 1985). In light of these precedents, we are convinced that our refusal to consider Langfitt's preemption argument will not work a miscarriage of justice.