Russel James GAUDET, Plaintiff-Appellant,

v.

EXXON CORPORATION, Defendant-Appellee.

Ruven ST. PIERRE, Plaintiff-Appellant,

v.

EXXON CORPORATION et al., Defendants-Appellees.

Ruven J. ST. PIERRE, Plaintiff-Appellant,

v.

EXXON CORPORATION, Bennie P. Toups, Richard N. Boss and Joe W. Moore, Defendants-Appellees.

Nos. 75–3101, 76–1196 and 76–2668.

United States Court of Appeals, Fifth Circuit.

Nov. 4, 1977.

Rehearing Denied Dec. 14, 1977.

Rehearing and Rehearing En Banc Denied Dec. 19, 1977.

---

Anatole J. Plaisance, Lafayette, La., for plaintiff-appellant in No. 75–3101.

Jack J. Cousin, New Iberia, La., for defendant-appellee in No. 75–3101.

Michael X. St. Martin, Danny J. Lirette, Houma, La., for plaintiff-appellant in Nos. 76–1196 and 76–2668.

John J. Cooper, New Orleans, La., for Booker Drilling Co., et al.

Gene S. Palmisano, Ivan D. Warner, III, New Orleans, La., for Exxon Corp.

Before MORGAN and RONEY, Circuit Judges, and KING *, District Judge.

JAMES LAWRENCE KING, District Judge:

Appellants in these cases seek review of orders in their respective trials granting summary judgment in favor of all defendants. The single issue presented is whether the trial courts erred in holding as a matter of law that appellants were barred by the Longshoremen's and Harbor Workers' Compensation Act [1] (LHWCA) from maintaining suits for negligence against defendants. For reasons to follow, we affirm in all cases.

Appellant Gaudet (No. 75–3101) originally worked for Tidelands Marine Service, Inc. ("Tidelands"). In 1963, under an arrangement with Tidelands, Gaudet began general maintenance and repair [2] at Exxon's West Delta Block 73, a complex of eight fixed platform oil drilling rigs located on the Outer Continental Shelf offshore the State of Louisiana.[3] There Gaudet, while engaged in regular duty under the supervision of Exxon's field foreman, sustained injury to his knee when struck by a barrel falling from a rack. Gaudet brought suit against Exxon for negligence.

The District Court granted summary judgment for Exxon, finding that the essential facts were not in dispute and those facts established that Gaudet could not sue Exxon for negligence because he had become Exxon's "borrowed employee," whose exclusive remedy lay under the LHWCA.[4] Gaudet appealed and challenged the appropriateness of the summary judgment.

---

* District Judge of the Southern District of Florida, sitting by designation.

1. 33 U.S.C. § 901 et seq.

2. According to the record, Gaudet was regularly employed at Exxon's West Delta Block 73 for some 14 or 15 years. Initially, he worked as a roustabout in the drilling operations, then later, as a pumper's helper. When the United States Coast & Geodetic Survey Safety Regulations came in effect, he was one of the most experienced men in the field, and because of that he was put to training others (both Tideland's employees and Exxon's regular employees) to perform the work required to comply with those regulations. After a time, when Exxon's regular employees had been trained Exxon "phased out" the other Tideland's employees, keeping only appellant and placing him in a four-man group to work under Exxon's field foremen and field superintendent.

3. The Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 et seq., the jurisdictional base for these suits, specifically makes applicable the provisions of the Longshoremen's and Harbor Workers' Compensation Act for compensation for injuries sustained by employees engaged in the work of producing oil or gas or other natural resources from subsoil or seabed of the outer continental shelf. § 1333(c). The Louisiana negligence law, pursuant to which plaintiffs sought recovery, is incorporated into federal law by this Act. § 1333(a)(1). *Aymond v. Texaco*, 554 F.2d 206 (5th Cir. 1977).

4. 33 U.S.C. § 905 provides: "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee." *See Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

33 U.S.C. § 933(i) furthermore, precludes suits against fellow employees under the LHWCA:

"The right to compensation or benefits under this Chapter shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed by the negligence or wrong of any other person or persons in the same employ.

. . .

*See Hughes v. Chitty*, 283 F.Supp. 734 (E.D. La.1968), aff'd 415 F.2d 1150 (5th Cir. 1969). The constitutionality of the exclusivity provisions was upheld in *Keller v. Dravo Corp.*, 441 F.2d 1239 (5th Cir. 1971). *See also Nations v. Morris*, 311 F.Supp. 771 (E.D.La. 1971), aff'd 483 F.2d 577 (5th Cir. 1973).

Appellant St. Pierre (Nos. 76–1196 and 76–2668) originally worked for Bourne Welding Services, Inc. ("Bourne"). Some 17 years ago Bourne furnished him to Exxon at whose direction he worked on the offshore production facility known as Grand Isle Block 16. He was under the supervision of Field Maintenance Foreman ("gang pusher") Bennie P. Toups when he stood on a 55-gallon chemical drum to weld a channel iron for the installation of an electric generator. He was injured when the drum exploded from hot slag from his weld. The District Court rendered summary judgment against St. Pierre in his suit against Exxon for negligence. Subsequently he filed against Exxon and fellow supervisory employees Toups, Boss, and Moore, but he was again defeated at the summary judgment stage. In each case the court held that the suit was barred by the LHWCA because of St. Pierre's status as a "borrowed employee." St. Pierre appealed.

## THE BORROWED EMPLOYEE DOCTRINE AND THE LHWCA

■ In *Standard Oil v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909) the Supreme Court recognized the concept of the borrowed employee or borrowed servant doctrine thusly:

> One may be in the general service of another, and, nevertheless, with respect to particular work, may be transferred, with his own consent or acquiescence, to the service of a third person, so that he becomes the servant of that person with all the legal consequences of the new relation. *Id.* at 220, 29 S.Ct. at 253, 53 L.Ed. at 483.

The court further explained:

> It sometimes happens that one wishes a certain work to be done for his benefit and neither has persons in his employ who can do it nor is willing to take such persons into his general service. He may then enter into an agreement with another. If that other furnishes him with men to do the work and places them under his exclusive control in the performance of it, those men became *pro hac vice* the servants of him to whom they are furnished. . . . [In this] case, he to whom the workmen are furnished is responsible for their negligence in the conduct of the work, because the work is his work and they are for the time his workmen. *Id.* at 221, 29 S.Ct. at 254, 53 L.Ed. at 483.

As the court clearly held, under the borrowed employee doctrine, an employer will be liable through *respondeat superior* for negligence of an employee he has "borrowed," that is, one who does his work under his supervision and control.

According to the court, to determine whether an employee is the employee of his original employer or the borrowed employee of another

> we must inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the [servant] in the performance of [his] work. *Id.* at 221–222, 29 S.Ct. at 254, 53 L.Ed. at 483–84.

■ In *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 312–13 (5th Cir. 1969), this court mentioned nine factors to be evaluated in determining whether an employee is to be considered a borrowed employee of another:

(1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?

(2) Whose work is being performed?

(3) Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

(4) Did the employee acquiesce in the new work situation?

(5) Did the original employer terminate his relationship with the employee?

(6) Who furnished tools and place for performance?

(7) Was the new employment over a considerable length of time?

(8) Who had the right to discharge the employee?

(9) Who had the obligation to pay the employee?

*Ruiz* failed to detail how the test should be applied, which factors are to be given primary weight, and which, if any factors, are controlling. Apparently they are to be weighed as appropriate in each particular case, because the court went on to state that "no one of these factors, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship." *Id.*[5]

Appellants argue that *Dugas v. Pelican Const. Co., Inc.*, 481 F.2d 773 (5th Cir. 1973) indicates that of all the *Ruiz* factors, the agreement between borrowing and lending employer should be given controlling weight. In *Dugas* this court remarked, "[E]ssential to [the borrowed employee] relationship is some type of agreement, written or verbal, formal or informal, between the general employer and the temporary employer evidencing an intention to create that relationship." *Id.* at 778. Taken out of context, this idea does not precisely square with *Ruiz*. But central to the holding in *Dugas* was the lack of "even minimal suggestion, criticism, recommendation, or advice" to the employee. 481 F.2d at 778. Therefore we are inclined to view *Dugas'* emphasis on the agreement between employers as "broad language . . . more expansive than . . . necessary to decide the case, correctly decided on its facts." *Davis v. Estelle*, 529 F.2d 437, 442 (5th Cir. 1976). Notably, this court in *Dugas* finally reached the same conclusion we had reached in *Ruiz*: "[N]o one factor or specific combination of factors is determinative of the borrowed employee relationship." 481 F.2d at 778.

■ To decide which *Ruiz* factors, if any, should be determinative in this case, the use of the borrowed employee doctrine to extend the coverage of the LHWCA and thus

to bar common law damage actions must be examined. Used in this context, the doctrine bears little resemblance to that doctrine evolved to hold the proper employer responsible for the torts of his employee, the concept of *respondeat superior*. *See Standard Oil v. Anderson*, 212 U.S. 215, 29 S.Ct. 252, 53 L.Ed. 480 (1909); *Benoit v. Hunt Tool Co.*, 219 La. 380, 53 So.2d 137 (1950).[6] Within the context of *respondeat superior* the focus on control in the traditional test of borrowed employee status is proper, because only if the employee acted under the orders of his employer should injuries to third parties be traced to the original negligence of the employer. In the instant case, however, instead of being a device to impute liability, the borrowed employee doctrine is a means to escape it through the exclusive remedy provisions of the LHWCA.

■ The LHWCA was designed to provide an injured employee with certain and absolute benefits in lieu of possible common law benefits obtainable only in tort actions against his employer. *See Haynes v. Rederi A/S Aladdin*, 362 F.2d 345 (5th Cir. 1966), *cert. denied*, 385 U.S. 1020, 87 S.Ct. 731, 17 L.Ed.2d 557. Although the coverage of the LHWCA is not contractual and does not depend upon the consent of the parties, nonetheless when an employee begins work for an employer under the coverage of the LHWCA, he is presumed to have consented to the Act's trade-off of possibly large common law damages for smaller but certain LHWCA benefits. And by the very act of continuing in employment, he may be assumed to agree that, considering the likelihood of injury and the likely severity of injury within the working conditions he experiences, the benefits offered by the LHWCA in the event of injury are acceptable.

---

5. The *Ruiz* factors were followed in *Champagne v. Penrod Drilling Co.*, 341 F.Supp. 1282, 1284–85 (W.D.La.1971), *aff'd* 459 F.2d 1042 (5th Cir. 1972), where the court agreed that "no fixed test is used to determine the relationship." *Id.*

6. Although the *Standard Oil* Court envisioned that the doctrine would apply to "all . . . legal consequences [of employment]," this was merely *dicta* as *Standard Oil* was a *respondeat superior* case.

Under the LHWCA an employee retains the right to sue third parties.[7] *Crawford v. Pope & Talbot, Inc.*, 206 F.2d 784 (3d Cir. 1953). It would be unfair to expect an employee to waive this right against third parties, because generally he has had no opportunity to evaluate the risks that third parties present him. Thus if an employee momentarily leaves the work site of his original employer and begins work temporarily for another employer, it might be unfair to deprive him of common law remedies before he can amply assess the risk in the new location. Likewise, if he changes locations but brings the working conditions of his original employment including the original risks, to the new location, he is still aware principally of the risks inherent in the first work situation and cannot be presumed to have consented to risks beyond them. But if an employee *continues* working in a new location, exposed to risks resulting from the direction and control of the new employer, there must come a time when policy dictates the LHWCA should apply, and the new employer, and new co-employees, should no longer be considered third parties but a true employer and true co-employees, liable only under the LHWCA.

Thus in the instant case the question is whether the circumstances of appellants' employment are such that Exxon should be considered an employer and not a third party under the LHWCA. As this is a matter of line-drawing guided by policy, the facts of each case must control the result. Considering this as best viewed as a question of the extent of coverage under the LHWCA, federal law applies. The traditional borrowed employee test, with its emphasis on control revealing its heritage in *respondeat superior*, has answered the question. In many cases, as in the instant one, the traditional test yields conclusions valid in the LHWCA context, but that doctrine should not be applied blindly, especially in circumstances in which it did not evolve.

[11] Of the constellation of *Ruiz* factors that may decide the issue then, certain factors are most pertinent when the borrowed employee doctrine is used as a defense to common law liability in the LHWCA context. The principal focus within the *Ruiz* test in this case should therefore be: (1) was the second employer itself responsible for the working conditions experienced by the employee, and the risks inherent therein and, (2) was the employment with the new employer of such duration that the employee could be reasonably presumed to have evaluated the risks of the work situation and acquiesced thereto? The first test, of course, parallels the *Ruiz* tests of which employer furnishes tools and place of performance and whether the first employer has terminated his relationship with the employee. The second parallels the tests of employment over a considerable length of time and agreement or acquiescence by the employee. Other factors in *Ruiz* may of course be helpful to the court in evaluating whether the LHWCA should apply in a given case, but no others should be considered essential.

## PROPRIETY OF SUMMARY JUDGMENT

In each case below, the trial court considered various documentary evidence submitted by the parties and concluded that, with regard to those issues found to be determinative of borrowed employee status, no material issues of fact remained. The court then granted summary judgment for Exxon. Appellants urge that the granting of summary judgment on this point was inappropriate because whether one is a borrowed employee is itself an issue of disputed fact which should not be determined at summary judgment.

This court as well as the Seventh and Ninth Circuits have held that "the issue of whether a relationship of borrowed servant existed is a matter of law." *Ruiz v. Shell Oil Co.*, 413 F.2d 310, 314 (5th Cir. 1969); *Gudgel v. Southern Shippers, Inc.*, 387 F.2d 723 (7th Cir. 1967); *McCollum v.*

---

7. A limitation on this right is the prohibition of suits against co-employees. *See* n. 4, *supra*.

*Smith*, 339 F.2d 348 (9th Cir. 1964).[8] We agree that the issue is best considered an issue of law. A dispute over whether one is a borrowed servant (or in a broader context, whether the LHWCA should apply) could still exist although all the facts were stipulated, for it concerns not only the facts themselves but the implications to be drawn from the facts. In *Kiff v. Travelers Ins. Co.*, 402 F.2d 129, 131 (5th Cir. 1968), we held that when

> the determinative factual ingredients of [the] employment status are not disputed[,] [t]he only question presented, then, is whether these basic facts require the imposition of liability . . . .. This question of law should have been decided by the court, not the jury.

The trial court found that sufficient "determinative factual ingredients," *i. e. Ruiz* factors, were undisputed to warrant a conclusion that appellants' common law actions for negligence were barred against Exxon and other defendants. Appellants cannot generate a factual dispute merely by contesting the conclusion reached by the court, rather they must show that genuine disputes exist over enough determinative factual ingredients to make a difference in this result.

 Appellants argue that a disputed material issue of fact exists concerning the agreement between the original employers and Exxon, and that resolution of this issue is essential in light of *Dugas*. The agreements between the appellants original employers, Tideland and Bourne ("Contractor") and Exxon are identical and read as follows:

> It is understood and agreed that all work so done by Contractor shall meet with the approval of [Exxon's] representatives, but that the detailed manner and method of doing the work shall be under the control of Contractors, [Exxon] being interested only in the result obtained and that Contractor is an independent Contractor as to all work performed hereunder.

This seems to indicate that the parties intended appellants to be independent contractors and not borrowed employees. But Exxon cites a further provision which it contends indicates that the parties contemplated a borrowed employee relationship might exist.

> Claims made against persons or firms by an employee of the Named Insured based on the 'doctrine of borrowed servant' shall, for the purpose of this insurance, be treated as a claim arising under this policy against the Named Insured, and such persons or firms shall have benefit of this insurance to that extent.

A trial court cannot appropriately resolve disputed issues of material fact in granting summary judgment. However, we have already held that the *Dugas* language indicating that the agreement between borrowing and lending employers is *essential* to the resolution of the borrowed employee issue, cannot be taken at face value. Thus the trial court could have concluded that the test for borrowed employee status was met *regardless* of the ultimate resolution of the factual matter of the agreement between the employers. We will not insist upon the expense and delay of a trial if the overall issue can be resolved through a preponderance of other factual matters *not* in dispute.

In *Gaudet*, plaintiff's deposition establishes that he performed work exclusively under the direction and control of *Exxon*, and was subject to *Exxon's* dismissal. Significantly, it appears undisputed that Gaudet had worked on the *Exxon* platform, with full opportunity to evaluate the risks for over 12 years. During all of that time he had acquiesced in this arrangement. Exxon furnished all of the major tools of his employment and was the employer who established Gaudet's working conditions, including the risks inherent thereto. In *St. Pierre* it likewise is undisputed that St. Pierre worked under the direction and control of *Exxon* while performing *Exxon's*

---

**8.** *But see Guidry v. Texaco, Inc.*, 430 F.2d 781 (5th Cir. 1970), affirming the trial court on the borrowed employee issue because the trial court's findings were not "clearly erroneous," a standard of review appropriate for matters of fact. *Id.* at 784.

work. He had worked under this arrangement exposed to risks created by Exxon, for some 17 years.

On this undisputed evidence, the trial courts correctly concluded that appellants' sole remedy against Exxon was under the LHWCA. Whether using the traditional borrowed employee test found in *Standard Oil*, the somewhat expanded test of *Ruiz*, or our suggested focus within that test, sufficient basic factual ingredients are undisputed to warrant the entry of summary judgment. Thus the judgments below are

AFFIRMED.