JUDE G. GRAVOIS, Judge.
[¡¡In this suit for personal injuries, plaintiff, Yvonne McGlothurn, appeals the trial *218 court’s grant of summary judgment in favor of defendants, Northrop Grumman Shipbuilding, Inc.[1] (“Northrop Grumman”), its insurer, National Union Fire Insurance Company of Pittsburgh (“National Union”), and the alleged tort-feasor, Jefferson Wade, which found plaintiff to be the borrowed servant of Northrop Grumman and thus dismissed her tort suit against defendants.[2] Plaintiff was directly employed by Pinkerton Government Services, Inc. (“Pinkerton”), performing security services on the premises of Northrop Grumman’s Avondale Shipyard on June 30, 2010, when the security vehicle she was driving was struck |sby a forklift being driven by Mr. Wade,[3] a Northrop Grumman employee. On appeal, plaintiff argues that genuine issues of material fact remain regarding her status as a borrowed servant. She contends that the trial court misapplied the “Ruiz ”[4] factors to the particular facts of this case, and further failed to distinguish this case from the facts in Musa v. Litton-Avondale Industries, Inc., 10-627 (La.App. 5 Cir. 3/29/11), 63 So.3d 243, writ denied, 11-1256 (La.9/23/11), 69 So.3d 1163. She asks that the judgment in favor of defendants be vacated and the matter be allowed to proceed to a jury trial.
Following our de novo review of the entire record of this matter, for the following reasons, we affirm the judgment of the trial court under review.

FACTS AND PROCEDURAL HISTORY

The record reflects that Ms. McGlothurn was directly employed by Pinkerton and was in the course and scope of her duties as a security guard supervisor at Northrop Grumman’s Avondale Shipyard on June 30, 2010 when the security truck she was driving was struck by a forklift being driven by a Northrop Grumman employee, Jefferson Wade. Plaintiff received workers’ compensation benefits (weekly and medical) from Pinkerton. On May 27, 2011, plaintiff filed suit for personal injuries against Northrop Grumman, its insurer, National Union, and Mr. Wade under the theory of respondeat superior. Following discovery, Northrop Grumman and National Union moved for summary judgment against plaintiff, arguing that as a matter of law, plaintiff was the borrowed servant of Northrop Grumman and thus was immune from tort liability in this case. Following a hearing on the motion, the trial court granted summary judgment in favor of defendants and dismissed plaintiffs suit. This appeal followed.

JiLAW AND ANALYSIS

In this matter, we are governed by the law concerning summary judgments. Ap *219 pellate courts review a district court’s grant of summary judgment de novo, viewing the record and all reasonable inferences that may be drawn from it in the light most favorable to the non-movant. Hines v. Garrett, 04-0806 (La.6/25/04), 876 So.2d 764, 765. A motion for summary judgment should be granted only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show that there is no genuine issue as to material fact and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966.
A material fact is one that potentially insures or prevents recovery, affects a litigant’s ultimate success, or determines the outcome of the lawsuit. Smith v. Our Lady of the Lake Hosp., Inc., 93-2512 (La.7/5/94), 639 So.2d 730, 751. An issue is a genuine issue if it is such that reasonable persons could disagree; if only one conclusion could be reached by reasonable persons, summary judgment is appropriate, as there is no need for trial on that issue. Id. Whether a particular fact is material can be seen only in light of the substantive law applicable to the case. Hubbard v. Jefferson Parish Parks and Recreation, 10-24 (La.App. 5 Cir. 5/25/10), 40 So.3d 1106, 1110.
Summary judgment procedure is intended to make a just and speedy determination of every action. La. C.C.P. art. 966. It is favored and the procedure shall be construed to achieve this intention. Id. Under La. C.C.P. art. 966, the initial burden is on the mover to show that no genuine issue of material fact exists. If the moving party points out that there is an absence of factual support for one or more elements essential to the adverse party’s claim, action or defense, the nonmoving party then must produce factual support sufficient to establish that he will be able to satisfy his evidentiary burden of proof at trial. La. C.C.P. art. 966(C)(2). If the nonmoving party fails to do so, there is no genuine issue of material fact, and summary judgment should be granted. La. C.C.P. arts. 966 and 967; Patemostro v. Wells Fargo Home Mortg., Inc., 09-469 (La.App. 5 Cir. 12/8/09), 30 So.3d 45; Simms Hardin Co., LLC v. 3901 Ridgelake Drive, L.L.C., 12-469 (La.App. 5 Cir. 5/16/13), 119 So.3d 58, 64, writ denied, 13-1423 (La.9/27/13), 123 So.3d 726.
The borrowed servant doctrine has been codified in La. R.S. 23:1031(C) as follows:
C. In the case of any employee for whose injury or death payments are due and who is, at the time of the injury, employed by a borrowing employer in this Section referred to as a “special employer”, and is under the control and direction of the special employer in the performance of the work, both the special employer and the immediate employer, referred to in this Section as a “general employer”, shall be liable jointly and in solido to pay benefits as provided under this Chapter. As between the special and general employers, each shall have the right to seek contribution from the other for any payments made on behalf of the employee unless there is a contract between them expressing a different method of sharing the liability. Where compensation is claimed from, or proceedings are taken against, the special employer, then, in the application of this Chapter, reference to the special employer shall be substituted for reference to the employer, except that the amount of compensation shall be calculated with reference to the earnings of the employee under the general employer by whom he is immediately employed. The special *220 and the general employers shall be entitled to the exclusive remedy protections provided in R.S. 28:1032.
The issue of whether a borrowed servant relationship exists is a matter of law for the court to determine. Musa v. Litton-Avondale Industries, Inc., supra; Griffin v. Wickes Lumber Co., 02-0294 (La.App. 1 Cir. 12/20/02), 840 So.2d 591, writ denied, 03-1338 (La.9/19/03), 853 So.2d 640.
This Court recently had the opportunity to review the issue of borrowed servant status in Musa v. Litton-Avondale Indus., Inc., supra, and said the following:
| (¡Borrowed employee disputes arise when a defendant who is not a plaintiffs formal employer argues that the plaintiff is in fact acting as the defendant’s employee. West v. Kerr-McGee Corp., 765 F.2d 526, 529 (5 Cir.1985). To determine whether an employee is the borrowed employee of another, the court must “inquire whose is the work being performed, a question which is usually answered by ascertaining who has the power to control and direct the (servant) in the performance of (his) work.” Gaudet [v. Exxon Corp.], [562 F.2d 351] supra at 355 [ (5 Cir.1977) ].
Various criteria have been considered in determining whether the borrowed servant doctrine is applicable. These criteria were set forth in Ruiz v. Shell Oil Co., 413 F.2d 310 (5 Cir.1969). While no one of these factors, standing alone, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship, the following tests have been given great weight: (1) Who has control over the employee and the work being performed? (2) Whose work is being performed? (3) Was there an agreement between the formal employer and the borrowing employer? (4) Did the employee acquiesce in the new work situation? (5) Did the original employer terminate his relationship with the employee? (6) Who furnished tools and place for employment? (7) Was the new employment over a considerable length of time? (8) Who has the right to discharge the employee? and (9) Who had the obligation to pay the employee? Id. at 312-13.
Musa v. Litton-Avondale Indus., Inc., supra, 63 So.3d at 246.
Northrop Grumman supported its motion for summary judgment with a copy of plaintiffs petition for damages, its answer and third-party demand, portions of plaintiffs deposition, and a copy of the contract between Northrop Grumman and Pinkerton for security services dated May 7, 2004. Northrop Grumman also set forth the following thirty-five “uncontested” facts in support of its motion for summary judgment, to-wit:
1. In 1995, Yvonne McGlothurn was hired by Northrop Grumman as a security guard at the Avondale shipyard.
2. Ms. McGlothurn’s job duties included checking employees for ID badges, hard hats, safety glasses, and steel toed shoes, and signing them in and out of the shipyard.
3. The Northrop Grumman employees were signed in and out on Northrop Grumman log sheets which were retained by Northrop Grumman.
4. Ms. McGlothurn also did vehicle inspections on any commercial vehicles entering the yard, which involved lifting the hood, |7checking under trucks with a long mirror for potential bombs, ensuring people were not attempting to sneak into *221 the shipyard, checking for weapons, etc.
5. Northrop Grumman provided the long mirrors for the inspections and well as radios.
6. Ms. McGlothurn also did medical runs, fire runs, and boarded ships for key runs.
7. Medical runs and fire runs occurred at least twice daily, and involved clearing the way and directing traffic in the event of injuries or fires in the yard.
8. Key runs involved inspecting the ships at least twice per day, for issues such as vandalism, open doors, flooding, etc.
9. Ms. McGlothurn’s other duties included fire drills, transporting employees around the yard and escorting terminated employees.
10. In performing her various job duties, Ms. McGlothurn drove around the shipyard in a Ford F150 truck owned by Northrop Grumman.
11. In 2001, Northrop Grumman outsourced security for the shipyard to Pinkerton Government Services, Inc.
12. According to Ms. McGlothurn, Northrop Grumman entered into a contract with Pinkerton which called for retention of the same security employees. According to Ms. McGlothurn, the security personnel, including Ms. McGlothurn, were to be employed by Pinkerton but were to keep their status, seniority, vacation time, insurance etc. exactly as it was when employed directly by Northrop Grumman.
13. The security crew did not go to Pinkerton’s offices when this change over took place; rather, Pinkerton came to Northrop Grumman and brought all of the paperwork to the security crew.
14. Ms. McGlothurn’s job duties remained the same after the change to Pinkerton. She solely provided security for Northrop Grumman.
15. Ms. McGlothurn’s pay remained the same after the change to Pinkerton, which meant that Pinkerton, which paid a lower salary, had to agree to keep the Northrop Grumman security crew at the higher salary they had received as direct Northrop Grumman employees.
16. The only change after the outsourcing was that Ms. McGlothurn punched in and out on a Pinkerton clock, wore a Pinkerton uniform and boots provided by Pinkerton, and Pinkerton issued Ms. McGlot-hurn’s pay checks rather than Northrop Grumman. |sAlso, Ms. McGlothurn was required to go through gun training and annual recertification by Pinkerton.
17. Pinkerton provided their employees with gun belts and guns; however, they had to be turned into the Northrop Grumman gun room at the end of each day.
18. In 2008, Ms. McGlothurn was promoted to lieutenant/supervisor. Her job duties changed in that she was also placed in charge of more than fifteen (15) workers and security officers. Ms. McGlothurn was in charge of the whole shipyard. She had to ensure that the gate was open, she had to check and patrol the docks at least twice or more per day, and she had to ensure that the officers were on the ships and that everyone was at his post. During this time, she contin *222 ued to drive around the shipyard in the Ford F150 truck owned and provided by Northrop Grumman.
19. At the time of the accident in June of 2010, Ms. McGlothurn had been working at the Northrop Grumman shipyard for approximately fifteen (15) years. Her position was lieutenant/supervisor. She had a Northrop Grumman badge. Her duties were to “control the yard,” which she did in a Northrop Grumman owned truck.
20. Ms. McGlothurn continued to drive the Northrop Grumman truck every day while she worked. The fuel for the truck was provided by the gas station in the Northrop Grumman yard, and all maintenance on the vehicle was performed by Northrop Grumman.
21. In June of 2010, Ms. McGlothurn’s Northrop Grumman supervisor on a daily basis was Mark Washington, and her Pinkerton supervisor on a daily basis was Major Ronald Green. She saw each man out at the yard every day. If anything was found during inspections, Ms. McGlothurn would notify both Northrop Grumman and Pinkerton supervisors, first calling the Northrop Grumman supervisor liaison.
22. According to Ms. McGlothurn, neither Washington nor Green could fire her without going through channels and investigations. Ms. McGlothurn identified her “boss” as Mr. Dorsey, who worked at Pinkerton’s Metairie office, who would come out to the yard for meetings, or to bring paperwork and the like.
23. Ms. McGlothurn’s daily routine was to arrive at 4:00 a.m. and check her Northrop Grumman email for any information, instructions or tasks sent by her Northrop Grumman supervisor, Mr. Washington, which needed to be passed along to the security officers during roll call.
24. At the end of each day, Ms. McGlothurn was required to send Mr. Washington an email confirming the tasks were accomplished. If Rthere was a specific problem, then Major Green would go directly to Mr. Washington.
25. On the day of the accident, Ms. McGlothurn arrived at 4:00 a.m., checked her email and performed roll call. Then she checked to see that everyone was at his post, and that all the gates were open. Then she “rode the complete yard” on the docks and called in over the radio. She then stood by, went to help check badges and generally stayed out in the field until Major Green came in at 8:00 a.m. Next, she did time reports for payroll. For the next few hours prior to the 12:40 p.m. accident, she went out in the field and checked all the officers and areas.
26. Ms. McGlothurn was at Wet Dock 3 when she was called and told to transport one of the office workers, Mrs. Sandra, from Gate 5 back to Operations.
27. As Ms. McGlothurn was heading toward Gate 5 in the Northrop Grumman F150 truck, she stopped at the stop sign near Gate 34 and then continued forward on Berma Road. A Northrop Grumman worker, Jefferson Wade, pulled up in a Big Red forklift and stopped at the stop sign on the cross-road to Ms. McGlothurn’s left, but then proceeded into the intersection and struck Ms. McGlothurn’s vehicle.
*223 28. The contract between Northrop Grumman (now Huntington In-galls) and Pinkerton Government Services, Inc. is entitled “Corporate Award No. 2163-R1 — Contract Security and related Personnel Services.” (hereinafter referred to as “Corporate Award”). It was originally for a term of May 1, 2001 through April 80, 2004 but was amended in 2010 to provide for a term of May 1, 2001 through April 30, 2013.[5] The stated purpose of the Corporate Award was to specify the terms and conditions by which Pinkerton would provide and Northrop Grumman would receive security and related personnel services.
29. Under the Benefits section of the Corporate Award, it is agreed that the Pinkerton employees will retain their vacation benefits as they were prior to the change to Pinkerton.
30. The Corporate Award provides that Pinkerton’s relationship to Northrop Grumman is that of an independent contractor. The Corporate Award further provides that Pinkerton employees are under Pinkerton’s direction and control. Finally, the Corporate Award provides that Pinkerton shall retain the right to hire and terminate all employees.
31. The Corporate Award also provides that, regarding Workmanship and Inspection, Northrop Grumman reserved the right to request Pinkerton to remove a Pinkerton employee at any time, with or |10without cause. Further, in the event of such removal, no Pinkerton employee could be reassigned to another Northrop Grumman facility.
32. The Corporate Award provides that Pinkerton will provide an on-site supervisor only in locations specifically identified by Northrop Grumman as necessary for Northrop Grumman’s requirements and operations.
33. Regarding Equipment, the Corporate Award provides that Pinkerton is responsible for providing uniforms, a weapon and ammunition, foul weather clothing, a flashlight and batteries, K-9s and handlers (where required), communications equipment (when specifically designated), patrol vehicles and equipment boxes in vehicles (if necessary), other motor vehicles (if required), personal safety equipment (if required by task) and waterfront patrol boats and fire apparatus (if requested).
34. The Corporate Award also required Northrop Grumman to furnish certain equipment and on-site space requirements, including FCC-approved frequency and base stations, office equipment (including computers), as well as office, meeting, parking and storage space.
35. Regarding Invoicing and Payment, the Corporate Award provides that time records shall be maintained on Pinkerton’s time sheets, and then Northrop Grumman would be billed for the hours worked on the Pinkerton time sheets.
Typically, the most universally accepted standard for establishing an employer-employee relationship is the issue of control, the first Ruiz factor. Musa, su *224 pra, at 246. Plaintiff argues on appeal that the trial court erred in failing to distinguish Musa, which found that Mr. Musa was Northrop Grummaris borrowed servant, from this case, because, she argues, Northrop Grumman had more control over Mr. Musa than it did over her job duties in this case. However, as noted by this Court in Musa, no one of the Ruiz factors, standing alone, or any combination of them, is decisive, and no fixed test is used to determine the existence of a borrowed servant relationship. Id. Accordingly, each case stands on its own facts and the implications to be drawn therefrom.

U,ANALYSIS OF RUIZ FACTORS

1. Who had control over plaintiff and the work being performed by plaintiff?

The contract between Pinkerton and Northrop Grumman stated in Article 19 that “Seller’s [Pinkerton’s] employees, agents or representatives (“Employees”) performing services under this Award shall at all times be under Seller’s [Pinkerton’s] direction and control.” Plaintiffs testimony in deposition shows, however, that in reality, Northrop Grumman exercised the majority of control over plaintiffs specific daily job duties. The evidence presented shows that after Northrop Grumman contracted out all of its security services to Pinkerton, plaintiffs day-to-day job duties essentially did not change from when she had been employed directly by Northrop Grumman, with the exception of the requirement that she be certified to and carry a firearm. Plaintiff was informed of her daily job duties by the Northrop Grumman liaison supervisor via Northrop Grumman email to plaintiff, and at the end of the day, she was required to report back to the Northrop Grumman supervisor regarding completion of those duties. Her daily duties included transporting Northrop Grumman employees from one location to another, as directed by Northrop Grumman personnel, and which she was in the process of doing when her vehicle was struck by the forklift. All of the rest of her daily duties, including security checks and roll call, were performed only at Northrop Grumman’s facility. She testified in deposition that she would report any issues that came up during the day to the Northrop Grumman liaison first, but then also to her Pinkerton supervisor. It was further established that Pinkerton personnel came to the Avondale Shipyard to facilitate the original change of employment, as well as delivering and receiving current paperwork, rather than the former Northrop Grumman employees going to Pinkerton’s local office.
| ^Pinkerton’s connection to the day-today activities of plaintiffs employment consisted of furnishing her with her uniform, gun and gun belt (which had to be returned to a Northrop Grumman office after plaintiffs shift), and boots. Other equipment required to do plaintiffs job, such as the truck, maintenance and fuel therefor, her communications radio, office supplies and computer, identification badge, and equipment for performing security checks on vehicles, was supplied by Northrop Grumman. Plaintiff testified that she did report matters to her Pinkerton supervisor as needed, but reported issues first to the Northrop Grumman liaison.
Upon review, we find that the evidence submitted viewed as a whole shows that Northrop Grumman, not Pinkerton, had the majority of control over plaintiffs daily job duties.

2. Whose work was being performed by plaintiff ?

This second Ruiz factor, whose work was being performed by plaintiff, has, in *225 other cases, been found to warrant minimal consideration. Musa, supra, at 247. In this case, it is clear that plaintiff was performing the particular security duties required by Northrop Grumman at its particular Avondale Shipyard location, which duties did not change when Northrop Grumman contracted its security duties out to Pinkerton. Plaintiff testified that the fact that plaintiff was required by Pinkerton to carry a firearm did not change her day-to-day duties. The fact that plaintiffs responsibilities increased and her duties changed when she was promoted to supervisor was not a specific consequence of working directly for Pinkerton.
3. Was there an agreement between the formal employer (Pinkerton) and the borrowing employer (Northrop Grumman) ?
The evidence clearly shows that Northrop Grumman and Pinkerton entered into a contract for Pinkerton to provide security services to Northrop Grumman at 11sthe Avondale Shipyard. The contract was considered by the trial court and its terms have not been disputed. It states that Pinkerton shall be considered an independent contractor of Northrop Grumman.[6] Unlike in the Musa case, the contract between the parties in this case did not contain any provision that purported to prohibit borrowed servant status. The contract regulated the relationship between Northrop Grumman and Pinkerton, but as plaintiff testified in deposition, it did not cause material changes in her day-today job duties after she became directly employed by Pinkerton.

4. Did plaintiff acquiesce in the new work situation ?

Plaintiff argues in brief that she did not acquiesce to being Northrop Grumman’s borrowed servant. Plaintiff, however, misstates the question that this particular Ruiz factor addresses. As noted in Musa, the question is, rather, whether the employee was aware of her new work conditions and chose to continue working in them. The answer to this question in this case is clearly “yes.” Plaintiff testified that she clearly understood that her direct employment changed from Northrop Grumman to Pinkerton when the contract went into effect in 2004, and she clearly understood the differences that this new employment relationship made, such as being trained to carry a firearm, receiving her paychecks from Pinkerton, and reporting to a Pinkerton supervisor in addition to her Northrop Grumman liaison. Her eventual promotion to supervisor is additional evidence that she chose to continue working under her new conditions, and apparently did so quite successfully.
|u5. Did the original employer (Pinkerton) terminate its relationship with plaintiff ?
Next, as directed by Musa, we consider whether Pinkerton severed its relationship with plaintiff while she was assigned to Northrop Grumman. As this *226 Court noted in Musa, this factor does not require the lending employer, here Pinkerton, to completely sever its relationship with the employee, because to do so would effectively eliminate the borrowed servant doctrine. Rather, the focus is on the lending employer’s relationship with the employee while the borrowing occurs. Musa, swpra, at 249.
The facts relative to the lending employer’s relationship with the employee in Musa are somewhat different from those in the present case, but such facts in Musa are nevertheless instructive herein. Mr. Musa was hired by International Marine, a subcontractor that supplied personnel to several different employers, including Northrop Grumman. He was assigned to Northrop Grumman in particular, but he had previously answered an advertisement by International Marine that could have resulted in his placement for employment at other agencies or employers.
In the present case, plaintiffs direct employment changed from Northrop Grumman to Pinkerton by virtue of Northrop Grumman’s decision to contract out all of its security requirements. Plaintiff was not first an employee of Pinkerton who was hired with the understanding that she could be placed at different locations as part of her employment, as was the case with Mr. Musa; rather, she accepted employment with Pinkerton specifically to continue doing the same job, having the same duties, and working at the same location as she had had while having been directly employed by Northrop Grumman at the Avondale Shipyard. No evidence was introduced that it was ever contemplated that plaintiff, as a 11sPinkerton employee, would be moved to work for any other customer to whom Pinkerton provided security services. Pinkerton’s connection with plaintiffs employment was primarily administrative. Pinkerton paid her and issued uniforms and a gun to her. Pinkerton’s personnel came over to Avon-dale to handle administrative issues and paperwork; plaintiff testified that she did not go to Pinkerton’s Metairie office, though she was able to identify a Pinkerton boss at that location. Pinkerton did maintain a supervisor at Avondale, but plaintiff testified that she reported first to the Northrop Grumman liaison, and also received her daily instructions from Northrop Grumman, to whom she also reported at the end of the day.

6. Who furnished plaintiff with the tools and place of her employment ?

The sixth Ruiz factor considers which employer furnished the plaintiff with the tools and place of her employment. Northrop Grumman clearly furnished plaintiff with the location of her employment. As previously discussed, plaintiff only worked at the Northrop Grumman facility after she became directly employed by Pinkerton. Further, it was never contemplated that plaintiffs employment with Pinkerton would cause her to work at the locations of any other Pinkerton customers.
Plaintiff clearly received tools from both Pinkerton and Northrop Grumman. Her uniform, gun, and boots were furnished by Pinkerton. Other tools, such as office equipment, computer, communications radio, badge, storage space, the tools with which she conducted security checks on vehicles, and her own security vehicle were furnished by Northrop Grumman. Additionally, Northrop Grumman maintained the security vehicle plaintiff used daily on the job, as well as provided its fuel.
| Vl7. Was plaintiff’s new employment with Northtrop Grumman over a considerable lenyth of time ?
The seventh Ruiz factor considers whether plaintiffs employment with the *227 purported borrowing employer was over a considerable length of time. Clearly in this case the answer is “yes.” Plaintiff was employed exclusively at the Avondale Shipyard location from the effective date of the contract between Pinkerton and Northrop Grumman in 2004, and as noted above, there was no evidence that it was ever contemplated that plaintiff would be reassigned by Pinkerton to provide security services for any of Pinkerton’s other customers. At the time of plaintiffs accident in 2010, she had worked for Pinkerton at this location for over five years.

8. Who had the right to discharge plaintiff?

Plaintiff testified that either employer would have to go “through channels” to discharge her. According to the contract between Pinkerton and Northrop Grumman, Pinkerton retained the right to hire and fire all employees covered by the contract. In the contract, however, Northrop Grumman also reserved the right to request Pinkerton to remove an employee at any time with or without cause, and that such removed employee never be reassigned to another Northrop Grumman location. In addition, the contract provided that no personnel unacceptable to Northrop Grumman would be assigned by Pinkerton to perform services under the contract, and that any covered employee was subject to immediate removal from the Avondale location for violation of any Northrop Grumman rules. Thus, Northrop Grumman retained the right to determine which Pinkerton employees were employed at the Avondale Shipyard location.

9. Who had the obligation to pag plaintiff?

The last Ruiz factor considers which employer had the responsibility to pay the employee. Plaintiff testified consistently with the contract provisions and the 117uncontested facts were that her paychecks were issued by Pinkerton. The contract provided that time records shall be maintained on Pinkerton’s time-sheets, and Northrop Grumman would be billed for the hours worked on the Pinkerton time-sheets.
In other cases where an employee has been paid by his direct employer, courts have nonetheless determined, after consideration of the totality of the other Ruiz factors, that an employee was a borrowed servant. See Musa, supra, at 249, and cases cited therein. Thus, this factor is not to be considered in isolation of the other Ruiz factors, and thus is not alone dispositive of the ultimate issue of plaintiffs borrowed servant status.

CONCLUSION

After our careful de novo review of the entire record of this matter, based on our above analysis of the application of the nine Ruiz factors to the undisputed facts of this case, we find no error in the trial court’s determination that at the time of the accident in question, plaintiff was the borrowed servant of Northrop Grumman. Accordingly, we find that no genuine issues as to material fact remain in this case and that defendants are entitled to judgment as a matter of law. The trial court’s grant of summary judgment in favor of defendants and the consequential dismissal of plaintiffs tort suit are hereby affirmed.

AFFIRMED.

CHEHARDY, J., dissents with reasons.

. According to its answer, Northrop Grumman Shipbuilding, Inc. is now known as Huntington Ingalls Incorporated. It was erroneously referred to as "Northrop Grumman Systems Corporation” in plaintiffs petition for damages. For consistency purposes, it will simply be referred as "Northrop Grumman” in this opinion.

. Plaintiffs petition for damages named Mr. Wade, Northrop Grumman, and National Union as defendants. The motion for summary judgment was filed only by Northrop Grumman and National Union; however, the judgment under review granting summary judgment and dismissing plaintiffs claims was rendered in favor of Northrop Grumman, National Union, and Mr. Wade. The parties have not made the dismissal of plaintiff’s claims against Mr. Wade an issue in this appeal.

. Although the record does not reflect that service upon Mr. Wade was requested by plaintiff, he filed an answer to plaintiff's petition for damages and was represented by the same attorneys who represented Northrop Grumman and National Union in this matter.

. Ruiz v. Shell Oil Co., 413 F.2d 310 (5th Cir.1969).

. It appears these dates are typographical errors. The contract states in Article 3 that the original term is from 01 May 2004 through 30 April 2008.

. Article 19 of the contract provides:
INDEPENDENT CONTRACTOR Seller’s relationship to Northrop Grumman in the performance of any purchase order subject to this Award is that of an independent contractor. Seller’s employees, agents or representatives (“Employees”) performing services under this Award shall at all times be under Seller’s direction and control. Seller shall retain the right the right to hire and terminate all employees, pay all wages, salaries, and other amounts due its Employees in connection with this Award, and shall be responsible for all reports and obligations respecting them relating to social security, income tax withholding, unemployment compensation, worker’s compensation, and similar matters.