J-A05036-20

2020 PA Super 60

| | | |
|---|---|---|
| JAVIER SARDINA-GARCIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| BROWNSVILLE MARINE PRODUCTS, | : | No. 1254 WDA 2019 |
| LLC, A LIMITED LIABILITY COMPANY | : | |

Appeal from the Order Entered July 18, 2019
In the Court of Common Pleas of Fayette County Civil Division at No(s):
No. 2016-01748

BEFORE:  BENDER, P.J.E., BOWES, J., and PELLEGRINI, J.[*]

OPINION BY PELLEGRINI, J.:                     **FILED MARCH 13, 2020**

Javier Sardina-Garcia (Sardina-Garcia) appeals the order granting summary judgment in the Court of Common Pleas of Fayette County (trial court) as to his common law negligence claim against the defendant, Brownsville Marine Products, LLC (BMP).  Sardina-Garcia argues that BMP was not his "employer" under the Longshore and Harbor Workers' Compensation Act (LHWCA) and the exclusivity provision of the LHWCA does not bar him from raising his negligence claim.  After careful review, we affirm.

**I.**

We glean the following facts from the certified record.  Sardina-Garcia is a shipfitter who was employed by MK Industries (MK).  MK had a General

_____

[*] Retired Senior Judge assigned to the Superior Court.

Staffing Agreement (GSA) with BMP under which it would recruit qualified employees for BMP. *See* Motion for Summary Judgment, 5/16/18, Exhibit C— GSA at 1. MK and BMP agreed that MK would pay employees, withhold taxes, provide benefits, perform drug screens and criminal background checks, verify employment eligibility, provide unemployment insurance and workers' compensation benefits and handle any claims, and provide personal protective equipment and safety training to any employees it supplied for BMP. *Id.* In turn, BMP would supervise employees on its premises and provide a safe worksite and safety training as necessary, but would not provide the assigned employees with any benefits that were available to BMP employees. *Id.* at 1-2. MK paid the assigned employees from funds it received from BMP.

When Sardina-Garcia began his employment with MK, he signed an Employment Agreement outlining the terms of the relationship. *See* Plaintiff's Response to Motion for Summary Judgment, Exhibit 2—Employment Agreement, 10/18/13. The Employment Agreement specified that he was only eligible for employment benefits as an employee of MK and could not claim any benefits from any of MK's clients. The Employment Agreement also prevented Sardina-Garcia from seeking or accepting employment with any of MK's clients for one year after his last assignment with the client. Finally, the Employment Agreement confirmed that he "understands and agrees that he or she is employed by [MK] and is not an employee of any client of [MK]." *Id.* at 1.

Through his Employment Agreement with MK, Sardina-Garcia was assigned in October 2013 to construct barges for BMP at a BMP-owned facility. He worked at BMP for four to six days per week, eight to twelve hours per day. His hours were set by BMP and he received permission from his supervisors at BMP to work overtime or take days off. His supervisor would give him daily assignments and direct him where to work, but did not tell him how to perform his job as Sardina-Garcia was already trained and qualified to work as a shipfitter.[1] While he brought some of his own hand tools to work, the majority of his tools and protective gear were provided by BMP. BMP could not terminate Sardina-Garcia's employment, but if it was dissatisfied with his performance, BMP could notify MK to remove him from the assignment.

Sardina-Garcia continued work through this assignment until May 2015 when he was injured on the job. While carrying a large jack across the facility, he came across an unguarded opening in the floor. *See* Complaint, 9/6/16, at Paragraph 6. He jumped over the hole to avoid falling and landed on a discarded piece of metal, causing serious injuries to his right foot and ankle. *Id.* at Paragraphs 8-9. Following his injury, Sardina-Garcia received workers' compensation benefits pursuant to the LHWCA. The benefits were paid by MK's insurance carrier as required by the GSA. *See* GSA at 3.

---

[1] Sardina-Garcia does not read or speak English, so his supervisors would give him assignments by pointing to areas where work was needed, using drawings, or occasionally using a translation app on Sardina-Garcia's phone.

Sardina-Garcia subsequently filed a common law negligence action against BMP alleging that its failure to maintain safe working conditions caused his injuries. BMP filed an Answer and New Matter, and Amended Answer and New Matter, raising, *inter alia*, the LHWCA and the borrowed servant doctrine as a defense to the negligence claim. Following discovery, BMP filed a motion for summary judgment arguing that Sardina-Garcia's claim was categorically barred by the exclusivity provisions of the LHWCA. The trial court granted the motion for summary judgment and dismissed the claim.[2] Sardina-Garcia filed a timely notice of appeal, and he and the trial court have complied with Pa.R.A.P. 1925.[3]

---

[2] "[S]ummary judgment is appropriate only in those cases where the record clearly demonstrates that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." ***Atcovitz v. Gulph Mills Tennis Club, Inc.***, 812 A.2d 1218, 1221 (Pa. 2002); Pa. R.C.P. No. 1035.2(1). When considering a motion for summary judgment, the trial court must construe all facts of record and make all reasonable inferences in the light that most favors the non-moving party. ***See Toy v. Metropolitan Life Ins. Co.***, 928 A.2d 186, 195 (Pa. 2007). Any question as to whether there exists a genuine issue of material fact must be resolved against the moving party. ***Id***.

[3] On appeal, "an appellate court may reverse a grant of summary judgment if there has been an error of law or an abuse of discretion." ***Weaver v. Lancaster Newspapers, Inc.***, 926 A.2d 899, 902–03 (Pa. 2007) (internal citations omitted). A *de novo* standard of review applies as to whether there exists an issue of material fact, as this presents a pure question of law. ***Id***.

**II.**

**A.**

The LHWCA governs workers' compensation for individuals who suffer disability or death as a result of employment upon navigable waters or qualifying adjacent areas.[4]  33 U.S.C. § 903(a).  "Every employer shall be liable for and shall secure the payment to his employees of the compensation payable" under the statute, and employees are entitled to compensation regardless of fault for the cause of the injury.  33 U.S.C. § 904(a)-(b).  "The liability of an employer prescribed in section 904 of this title shall be exclusive and in place of all other liability of such employer to the employee. . . ."  33 U.S.C. § 905(a).  This statutory scheme represents a balancing of interests wherein "[e]mployers relinquished their defenses to tort actions in exchange for limited and predictable liability.  Employees accept the limited recovery because they receive prompt relief without the expense, uncertainty, and delay that tort actions entail."  *Peter v. Hess Oil Virgin Islands Corp.*, 903 F.2d 935, 951 (3d Cir. 1990) (citation omitted).

Thus, when an employee suffers an injury at work that is compensable under the LHWCA, he is prohibited from seeking further recovery through tort

---

[4] The parties agree that Sardina-Garcia's work as a shipfitter qualified him for compensation under the LHWCA.

J-A05036-20

actions against his employer. Federal courts[5] have read the LHWCA and its definition of "employer" to include "borrowing employers" who have a "borrowed servant" relationship to their employee. *See id.* at 940; ***Cruz v. Nat'l Steel & Shipbuilding Co.***, 910 F.3d 1263, 1269 (9th Cir. 2018). A borrowed servant is an "employee whose services are, with the employee's consent, lent to another employer who temporarily assumes control over the employee's work." BLACK'S LAW DICTIONARY, *Employee* (11th ed. 2019). The borrowed servant doctrine is an outgrowth of the common law rule that a servant who is loaned by his master to a third party is regarded as the servant

---

[5] This Court has provided that:

> absent a United States Supreme Court pronouncement, the decisions of federal courts are not binding on Pennsylvania state courts, even when a federal question is involved. When considering a given issue, however, we prefer Third Circuit decisions to those of other federal circuits, to discourage litigants from 'crossing the street' to obtain a different result in federal court than they would in Pennsylvania court. If, however, the Third Circuit has no law on a given question, we may seek guidance in the courts of appeals and district courts in other circuits.

***Graziani v. Randolph***, 856 A.2d 1212, 1218 (Pa. Super. 2004) (quoting ***Werner v. Plater–Zyberk***, 799 A.2d 776, 782 (Pa. Super. 2002)). Neither this court nor our Supreme Court has addressed the borrowed servant doctrine in the context of the LHWCA. Thus, we look to the federal courts for guidance.

of that third party while under that third party's direction and control. **Shamis v. Moon**, 81 A.3d 962, 970 (Pa. Super. 2013).[6]

In **Peter**, the United States Court of Appeals for the Third Circuit adopted the borrowed servant doctrine to determine whether the defendant was the plaintiff's employer under the LHWCA. 903 F.2d at 940. There, the court focused on two primary factors for evaluating the existence of a borrowed servant relationship: "(1) whether the borrowing employer was responsible for the borrowing employee's working conditions and (2) whether the employment was of such duration that the borrowed employee could be presumed to have acquiesced in the risks of his new employment." **Id.** at 942 (citing **Gaudet v. Exxon Corp.**, 562 F.2d 351, 357 (5th Cir. 1977)). The court ultimately concluded that the plaintiff in that case was a borrowed servant because his work was controlled, directed and supervised solely by the defendant, the defendant provided his safety equipment and was

---

[6] While this court has not addressed the borrowed servant doctrine in the context of the LHWCA, we have applied the doctrine under Pennsylvania's Workers' Compensation Act (WCA), which contains a similar exclusivity provision to that of the LHWCA. **See** 77 P.S. § 481(a). When determining whether a borrowed servant relationship exists in that context, the crucial consideration is whether the borrowed servant "passes under the [borrowing employer's] right of control with regard **not only to the work to be done but also to the manner of performing it**." **Shamis**, 81 A.3d at 967 (Pa. Super. 2013) (quoting **Mature v. Angelo**, 97 A.2d 59, 60 (Pa. 1953) (emphasis in original)). "Whether a company is an injured worker's employer under the borrowed employee doctrine under a given set of facts is a question of law." **Burrell v. Streamlight, Inc.**, ___ A.3d ___, 908 EDA 2019, at *2 (Pa. Super. Nov. 7, 2019).

responsible for his working environment, and the defendant, by paying the staffing agency, was responsible for his salary and LHWCA insurance. *Id.* The plaintiff had worked for the defendant for approximately ten months, demonstrating clear acquiescence to the working conditions and the defendant's control over his employment. *Id.*

The court noted that there were nine additional considerations for evaluating the existence of a borrowed servant relationship in the Fifth Circuit case law on which it relied, but these considerations were sublimated to the two essential factors listed above. *Id.* at 942 & n.7 (3d Cir. 1990); *see also Gaudet*, 562 F.2d at 356 (citation omitted) (listing the nine factors but noting, "none of these factors, or any combination of them, is decisive"). The additional considerations are:

> (1) Who has control over the employee and his work? (2) Whose work is being performed? (3) Was there an agreement between the original and borrowing employer? (4) Did the employee acquiesce in the new work situation? (5) Did the original employer terminate his relationship with the employee? (6) Who furnished the tools and place for performance? (7) Was the new employment over a considerable length of time? (8) Who has the right to discharge the employee? (9) Who had the obligation to pay the employee?

*Peter*, 765 F.2d at 942 & n.7 (citing *West v. Kerr-McGee Corp.*, 765 F.2d 526, 530 (5th Cir. 1985)). The court emphasized that the borrowed servant doctrine applies when there is "some expressed or implied contract of hire between the borrowed employee and the borrowing employer." *Id.* at 942.

Significantly, the **Peter** court relied on several precedents from the Fifth Circuit Court of Appeals in applying the borrowed servant doctrine to the exclusivity provision of the LHWCA and identifying the relevant test. In those cases, the Fifth Circuit held that when the relevant facts are undisputed, whether an employee constitutes a borrowed servant under the LHWCA is a question of law. **See, e.g.**, **Gaudet**, 562 F.2d at 357-58. Thus, **Peter** addressed the question as a matter of law based on the record before it on appeal, finding that no alternative conclusion could be drawn based on the facts before it. **Peter**, 765 F.2d at 942; **accord Cruz**, 910 F.3d at 1268 (holding as a matter of law that the plaintiff was the defendant's borrowed servant when she worked for nearly two years at the direction and control of the defendant, even though a staffing agency was responsible for her payroll). With these principles in mind, we turn to the merits of Sardina-Garcia's claim.

**B.**

Sardina-Garcia argues that the trial court erred in granting BMP's motion for summary judgment and finding as a matter of law that he was BMP's borrowed servant. He contends that the evidence adduced at summary judgment established genuine issue of material fact as to whether BMP was his employer at the time of his accident. We disagree.

As outlined previously, the two central considerations when determining whether a borrowed servant relationship exists are "(1) whether the borrowing employer was responsible for the borrowing employee's working conditions

and (2) whether the employment was of such duration that the borrowed employee could be presumed to have acquiesced in the risks of his new employment." *Peter*, 765 F.2d at 942. An examination of the GSA and of Sardina-Garcia's own deposition testimony reveal that BMP, not MK, was responsible for his daily working conditions. The GSA specifically placed the burden on BMP to provide the facility at which the work would be performed and safe working conditions. GSA at 1-2. Sardina-Garcia testified that BMP's supervisors assigned his shifts, approved any requested time off, and dictated whether he could work overtime. Depo. of Sardina-Garcia, 12/15/17, at 36-39. When he came into work, he would punch in on BMP's time clock and a BMP supervisor would tell him where he would be working and give him a specific assignment. *Id.* at 40, 46-48. While the BMP supervisors would give him instructions regarding the work that needed to be performed, Sardina-Garcia would choose how to perform the work based on his expertise as a shipfitter. *Id.* at 61. Whenever he had questions about the details of an assignment, he would consult the BMP supervisor and the supervisors would check his work once it was complete. *Id.* at 61-62. While Sardina-Garcia certainly relied on his own specialized expertise and training to perform his duties, BMP retained ultimate control over his worksite and work product.

The second consideration also weighs easily in favor of finding a borrowed servant relationship. Sardina-Garcia had been assigned to work at BMP for approximately 20 months at the time he was injured, and during that

period, he worked four to six days per week and eight to twelve hours per day. *Id.* at 35-37. Sardina-Garcia had worked for his borrowing employer for over twice as long as the plaintiff in *Peter*, whom the Third Circuit considered to be a borrowed servant. *Peter*. This lengthy relationship with BMP suggests that Sardina-Garcia acquiesced to the employment relationship for the purposes of the LHWCA. *See Gaudet*, *supra*, at 356 ("[B]y the very act of continuing in employment, [the borrowed servant] may be assumed to agree that, considering the likelihood of injury and the likely severity of injury within the working conditions he experiences, the benefits offered by the LHWCA in the event of injury are acceptable.").

While the nine additional considerations are not dispositive as to whether a borrowed servant relationship exists, we find that they also militate in favor of finding that Sardina-Garcia was BMP's employee. From the foregoing discussion, it is clear that BMP had control over Sardina-Garcia's work, Sardina-Garcia was performing solely BMP's work on a daily basis, and that the employment was over a significant length of time with Sardina-Garcia acquiescing to the working conditions. *Peter*, 765 F.2d at 942 & n.7 (as to considerations 1, 2, 4 and 7). In addition, the sixth consideration favors a finding that BMP was Sardina-Garcia's employer, as BMP furnished the place of employment as well as many of the tools and the protective gear. BMP provided Sardina-Garcia's fire retardant vest, gloves, goggles, face shield, masks, knee protection and welding hood. Depo. of Sardina-Garcia,

12/15/17, at 62-63. Sardina-Garcia brought his own hand tools to the site, but BMP provided the larger tools necessary for the work. *Id.* at 64-67.

The third consideration in determining whether the employee was a borrowed servant is the GSA between MK and BMP. *Peter*, 765 F.2d at 942 & n.7. The GSA outlined the parties' respective duties towards the employees recruited by MK, predominantly placing recruiting, payroll and benefits obligations on MK and day-to-day instructions and workplace control on BMP. *See* GSA at 1-2. Sardina-Garcia relies on *West v. Kerr-McGee Corp.*, 765 F.2d 526, 528, 531 (5th Cir. 1985), and *Aladay v. Patterson Truck Line, Inc.*, 750 F.2d 375, 377-78 (5th Cir. 1985), for the principal that a question of fact arises when the contract between the original and borrowing employer explicitly states that assigned employees will not become employees of the borrowing employer. *West* and *Aladay* are inapposite because there was no comparable provision in the GSA between MK and BMP.[7] The terms of the GSA do not suggest that the parties intended to prevent MK's employees from becoming borrowed servants of BMP. Further, whether a borrowed servant relationship exists is a question of law, and the outcome does not turn solely on the intent of the parties but rather on the full nature of the relationship

_____

[7] Sardina-Garcia also relies on a provision in his Employment Agreement with MK that states that he would not become an employee of any employer with whom he is placed by MK. However, the relevant consideration is the agreement between the borrowing and original employer, not the agreement between the original employer and the employee. *Peter*, 765 F.2d at 942 n.7.

between the staffing agency, the purported borrowing employer, and the employee.

Next, we consider whether BMP terminated Sardina-Garcia or had the right to do so. *Peter*, 765 F.2d at 942 & n.7 (considerations 5 and 8). While BMP did not directly terminate employees under the GSA, it did have the power to suspend MK's employees or request that MK remove the employee from the assignment. When BMP no longer wished to work with an MK employee, it would notify MK to remove the employee from the assignment. Depo. of Eva Metzger, 12/20/17, at 38-39. BMP also retained the authority to discipline MK employees. *Id.* On one occasion, Sardina-Garcia was, in fact, disciplined by BMP for failing to comply with a safety requirement and he was suspended from work for one day as a consequence. Depo. of Sardina-Garcia, 12/15/17, at 42-43. Even though BMP never terminated Sardina-Garcia, it had an attenuated ability to permanently remove him from its employment by contacting MK.

Finally, we consider which entity had the obligation to pay Sardina-Garcia for his work. *Peter*, 765 F.2d at 942 & n.7 (consideration 9). MK provided wages and benefits to its employees and was responsible for workers' compensation insurance, including LHWCA coverage, for all of its employees. *Id.* at 1, 3. While MK was responsible for payroll, all billing rates were agreed-upon in the GSA and BMP was responsible for approving time sheets and invoices for payroll. *Id.* at 2. In *Peter*, the Third Circuit found that even

though the staffing firm handled the logistics of the plaintiff's salary and LHWCA, the defendant was, in fact, responsible for paying those amounts through its contract with the staffing agency. ***Peter***, 765 F.2d at 942. The same logic holds here, and this factor weighs in favor of finding a borrowed servant relationship.

Accordingly, the two primary factors in the borrowed servant doctrine under the LHWCA, as well as the nine additional considerations, overwhelmingly support the trial court's finding that BMP was Sardina-Garcia's employer under the LHWCA. We discern no error in the trial court's judgment.

Order affirmed.


Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 3/13/2020